**EXECUTION VERSION**

**LSI HOLDCO LLC**

SECOND AMENDED AND RESTATED

LIMITED LIABILITY COMPANY AGREEMENT

Dated as of November 18, 2016

THE MEMBERSHIP INTERESTS REPRESENTED BY THIS SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS.  SUCH MEMBERSHIP INTERESTS MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN.

EXHIBIT A

## TABLE OF CONTENTS

ARTICLE 1 Definitions.................................................................................................................2

    1.1    Certain Definitions......................................................................................2
    1.2    Other Definitions .....................................................................................10
    1.3    Incorporation By Reference .....................................................................10

ARTICLE 2 Continuation of the Company ...............................................................................10

    2.1    Authorized Persons ..................................................................................10
    2.2    Principal Place of Business......................................................................10
    2.3    Registered Office and Registered Agent..................................................10
    2.4    Term.........................................................................................................10
    2.5    Purposes and Powers................................................................................11

ARTICLE 3 Management............................................................................................................11

    3.1    Management by Board of Managers.........................................................11
    3.2    Composition and Election of Board of Managers....................................13
    3.3    Meetings of the Board of Managers and Actions by Written Consent .................15
    3.4    Officers ....................................................................................................17
    3.5    Power of Attorney....................................................................................18
    3.6    Liability of Members of the Board of Managers. .....................................18
    3.7    Indemnification. .......................................................................................20
    3.8    Limitations on Authority of Board. .........................................................21

ARTICLE 4 Meetings of Members ............................................................................................22

    4.1    Place of Meetings.....................................................................................22
    4.2    Annual Meetings of Members ..................................................................22
    4.3    Special Meetings of Members ..................................................................23
    4.4    Notice of Annual & Special Meetings of Members.................................23
    4.5    Quorum ....................................................................................................23
    4.6    Voting on General Matters.......................................................................23
    4.7    List of Members Entitled to Vote ............................................................23
    4.8    Registered Members ................................................................................24
    4.9    Actions Without a Meeting and Telephone Meetings. ............................24
    4.10   Deemed Approval of the Members...........................................................24

ARTICLE 5 Members; Membership Interests...........................................................................24

    5.1    Membership Interests...............................................................................24
    5.2    Issuance of Additional Membership Interests..........................................25
    5.3    No Interest on Capital Contributions .......................................................25
    5.4    Noncompetition by St. Louis, Perry and Hamburg and Forfeiture of
            Granted Membership Interests..................................................................25

5.5    Confidentiality. ...............................................................................................26
5.6    Liability of Members .......................................................................................27
5.7    Pre-Emptive Rights. .........................................................................................27

ARTICLE 6 Capital Accounts; Allocations, Distributions.......................................................29

6.1    Capital Accounts. .............................................................................................29
6.2    Allocation of Profits and Losses ......................................................................30
6.3    Distributions......................................................................................................31
6.4    Tax Distributions. .............................................................................................32
6.5    Limitation Upon Distributions .........................................................................33
6.6    Special Allocations ...........................................................................................33
6.7    Tax Allocations. ...............................................................................................35
6.8    Distributions Upon Liquidation of the Company .............................................36

ARTICLE 7 Transferability.......................................................................................................37

7.1    Restrictions on Transfer of Membership Interests............................................37
7.2    Tag-Along Rights..............................................................................................37
7.3    Reserved............................................................................................................39
7.4    Death or Incapacity of Member .......................................................................39
7.5    Substituted and Additional Members................................................................40
7.6    Reasonableness of Restrictions ........................................................................40
7.7    Drag Along Rights ...........................................................................................41

ARTICLE 8 Dissolution and Termination.................................................................................42

8.1    Dissolution of the Company. ............................................................................42
8.2    Liquidation, Dissolution and Termination........................................................43

ARTICLE 9 Books and Records; Accounting; Tax Elections....................................................43

9.1    Accounts ...........................................................................................................43
9.2    Records and Reports .........................................................................................43
9.3    Tax Matters Partner..........................................................................................44
9.4    Financial Statements, Returns and Other Elections..........................................45

ARTICLE 10 Miscellaneous Provisions....................................................................................45

10.1    Notices ..............................................................................................................45
10.2    Application of Delaware Law; Arbitration .......................................................45
10.3    No Action for Partition .....................................................................................46
10.4    Headings and Sections ......................................................................................46
10.5    Amendment of Agreement and Certificate:  Change in Company Approval
        Procedure .........................................................................................................46
10.6    Informed Consent..............................................................................................47
10.7    Numbers and Gender ........................................................................................48

10.8    Binding Effect ...................................................................................................48
10.9    Counterparts and Facsimile Signatures ...........................................................48
10.10   Founder ............................................................................................................48
10.11   Amended and Restated Agreement ..................................................................48
10.12   Expenses ..........................................................................................................48
10.13   Prior Agreement ...............................................................................................48

**SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY
AGREEMENT OF LSI HOLDCO LLC**

THIS SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT (this "Agreement") of LSI HoldCo LLC, a Delaware limited liability company (the "Company"), dated effective as of 12:01 A.M. on November 18, 2016 (the "Effective Date"), is adopted and entered into by and among the Members (as hereinafter defined) pursuant to and in accordance with the Delaware Limited Liability Company Act in its present form or as amended from time to time (the "Act").

## RECITALS

A.    The Company was formed as a limited liability company under the Act pursuant to a Certificate of Formation filed with the Secretary of State of the State of Delaware on December 5, 2012 (the "Certificate") and entered into that certain Limited Liability Company Agreement of LSI HoldCo LLC dated effective January 1, 2013, as amended by the First Amendment and Second Amendment to the Limited Liability Company Agreement of LSI HoldCo LLC dated effective January 1, 2013 (with respect to the First Amendment) and March 4, 2013 (with respect to the Second Amendment), as further amended by the Third Amendment to the Limited Liability Company Agreement of LSI HoldCo LLC dated effective May 1, 2013, as further amended by the Fourth Amendment to the Limited Liability Company Agreement of LSI HoldCo LLC dated effective May 30, 2013, as further amended by the Fifth Amendment to the Limited Liability Company Agreement of LSI HoldCo LLC dated effective June 20, 2014, as further amended by the Sixth Amendment to the Limited Liability Company Agreement of LSI HoldCo LLC dated effective July 28, 2014, as further amended by the Seventh Amendment to the Limited Liability Company Agreement of LSI HoldCo LLC dated effective September 1, 2014 (the "Seventh Amendment") (collectively, the "Original LLC Agreement").

B.    Pursuant to the terms of the Seventh Amendment, the Members entered into that certain Amended and Restated Limited Liability Company Agreement of LSI HoldCo LLC dated effective January 1, 2015 (the "A&R LLC Agreement") to amend and restate the Original LLC Agreement.

C.    In connection with additional Capital Contributions to be made by certain of the Members as described herein (including by virtue of the conversion of loans after the date hereof under the Convertible Bridge Loan Agreement into Class A Interests pursuant to the Convertible Bridge Loan Agreement), the parties hereto desire to amend and restate the A&R LLC Agreement in its entirety as set forth herein.

## AGREEMENT

NOW THEREFORE, in consideration of the foregoing, of the mutual promises of the parties hereto, and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby amend and restate the A&R LLC Agreement in its entirety as follows:

1

# ARTICLE 1
## Definitions

1.1     Certain Definitions.  The terms specified in this Section 1.1 shall, for all purposes of this Agreement, have the following meanings, unless the context expressly or by necessary implication otherwise requires:

"Act" shall have the meaning set forth in the Preamble.

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Taxable Year, after giving effect to the following adjustments:

(i) Credit to such Capital Account any amounts that such Member is deemed to be obligated to restore pursuant to the penultimate sentences in Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), and

(ii) Debit to such Capital Account the items described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"A&R LLC Agreement" shall have the meaning set forth in the Preamble.

"Affiliate" means, with respect to any specified Person, any other Person who or which, directly or indirectly, controls, is controlled by, or is under common control with such specified Person.  Control will mean the possession, direct or indirect, of the voting power necessary to direct, or cause the direction of the management and policies of a Person, whether through the ownership of voting securities or by contract.  For purposes of this Agreement, Cancer Treatment Centers of America, Inc. and its Affiliates, shall be deemed to be Affiliates of SLG.

"Agreement" shall have the meaning set forth in the Preamble.

"Approved Sale" shall have the meaning set forth in Section 7.7(a).

"Board of Managers" or "Board" means the Board of Managers established in accordance with Section 3.2.

"Board Approval" shall mean the affirmative vote of members of the Board of Managers having a majority of the votes entitled to be cast by all members of the Board of Managers, or a written consent pursuant to Section 3.3 in lieu thereof.

"Book Value" means, with respect to any Company property, the Company's adjusted basis for federal income tax purposes, adjusted from time to time to reflect the adjustments

2

required or permitted by Treasury Regulation Section 1.704-1(b)(2)(iv)(d)-(g), as reasonably determined by the Board.

"Capital Account" means, with respect to any Member, the account maintained for such Member in a manner which the Board of Managers reasonably determines is in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv) and Section 6.1.

"Capital Contribution" means a contribution to the capital of the Company pursuant to this Agreement, the Original Agreement or the A&R LLC Agreement.

"Center" or "Centers" means any ambulatory surgery centers, clinics or consulting centers established by the Company or its Subsidiaries from time to time.

"Certificate" shall have the meaning set forth in the Recitals.

"Class A Holder" means a holder of Class A Interests.

"Class A Interest" means a Membership Interest having the rights and obligations specified with respect to Class A Interests in this Agreement.

"Class A Return" means, with respect to each Class A Interest, the amount accruing on a daily basis from the date of issuance at a rate of eight percent (8%) per annum, compounded quarterly, on (a) the Class A Unreturned Capital with respect to such Class A Interest, plus (b) the Class A Unpaid Return with respect to such Class A Interest for all prior periods. Upon issuance of the Class A Interests pursuant to the conversion of the loans outstanding under the Convertible Bridge Loan Agreement, the Class A Return with respect to the Class A Interests issued to each Member thereunder shall initially be an amount equal to eight percent (8%) per annum, compounded quarterly, on such portion of the loan thereunder made by such Member, pursuant to Section 1.9(a)(ii) of the Convertible Bridge Loan Agreement.

"Class A Unpaid Return" of a Class A Interest means, as of any date of determination, an amount equal to the excess, if any, of (a) the aggregate Class A Return accrued on such Class A Interest for all periods prior to such date, over (b) the aggregate amount of Distributions made, or treated as advances against Distributions, by the Company with respect to such Class A Interest pursuant to Section 6.3(a)(i) prior to such date.

"Class A Unreturned Capital" means, with respect to any Class A Interest, as of any date of determination, an amount equal to the excess, if any, of (a) the aggregate amount of Capital Contributions as set forth on Schedule A made in exchange for, or on account of, such Class A Interest (as adjusted for any splits, membership interests distributions, recapitalizations, and the like with respect to the Class A Interest to the extent not then reflected in Schedule A), over (b) the aggregate amount of Distributions made by the Company with respect to such Class A Interest pursuant to Section 6.3(a)(ii) prior to such date.

"Class B Holder" means a holder of Class B Interests.

"Class B Interest" means a Membership Interest having the rights and obligations specified with respect to Class B Interests in this Agreement.

"Class C Holder" means a holder of Class C Interests.

"Class C Interest" means a Membership Interest having the rights and obligations specified with respect to Class C Interests in this Agreement.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and the rules and regulations thereunder.

"Company" shall have the meaning set forth in the Preamble.

"Company Legal Matters" shall have the meaning set forth in Section 10.6(b).

"Company Minimum Gain" shall have the same meaning as the term "partnership minimum gain" set forth in Section 1.704-2(b)(2) and 1.704-2(d) of the Treasury Regulations.

"Company Notice" shall have the meaning set forth in Section 5.7(b).

"Competitive Activities" shall have the meaning set forth in Section 5.4(a).

"Confidential Information" shall have the meaning set forth in Section 5.5(a).

"Convertible Bridge Loan Agreement" means that certain Subordinated Loan Agreement, by and among the Company and certain Members, dated July 1, 2016, as amended, supplemented or modified from time to time or hereafter in accordance herewith.

"CTS" means CTS Equities Limited Partnership, a Florida limited partnership.

"DBF" means DBF-LSI, LLC, a Florida limited liability company.

"Disability" means the subject Person becomes, in the good faith opinion of the Board of Managers, physically or mentally unable to perform his duties, with or without any reasonable accommodation that may be required by the Americans With Disabilities Act of 1991, on a full-time basis, for a period of more than sixty (60) consecutive working days or for more than seventy-five (75) working days in the aggregate during any six (6) month period except that any leave pursuant to the Family and Medical Leave Act of 1991 shall not be counted as time away from work under this paragraph.

"Distribution" means each distribution made by the Company to a Member, whether in cash, property or securities of the Company; provided that none of the following shall be a Distribution: (a) any redemption or repurchase by the Company of any Membership Interests or other securities of the Company (including Membership Interests or other securities issued in exchange for Class B Interests, Class A Interests or Class C Interests), (b) any exchange of securities of the Company for new or additional equity securities of the Company, and (c) any

subdivision (by membership interest split or otherwise) or any combination (by reverse Membership Interest split or otherwise) of any outstanding Membership Interests.

"EFO" means EFO Laser Spine Institute, Ltd., a Florida limited partnership.

"Electing Members" shall have the meaning set forth in Section 7.2(a).

"Employment" or "Employed" means any employment by the Company or a Subsidiary of a Person individually as an employee or surgeon, or through any direct or indirect contractor or subcontractor relationship with the Company or a Subsidiary including any relationship involving entities owned or controlled by a Person whereby such Person provides services to the Company.

"Family Member" means, as applied to any Person who is an individual, such individual's spouse, parent, child, grandchild or other descendent thereof (whether natural or adopted).

"Fiscal Year" means the Company's fiscal year, which shall be the calendar year.

"Granted Membership Interests" means the Perry Membership Interest, the St. Louis Membership Interest, and the Hamburg Membership Interest.

"Hamburg" means Glenn Hamburg, a natural Person.

"Hamburg Membership Interest" means the Membership Interest of Glenn Hamburg as described in and subject to the restrictions of Section 5.4.

"Horne Management" means Horne Management, Inc., a Florida corporation.

"Manager" means, at any time, each then-current individual on the Board of Managers who, for purposes of the Act, will be deemed a "manager" (as such term is defined in the Act), but will be subject to the rights, obligations, limitations and duties set forth in this Agreement.

"Majority in Interest" means one or more Members (or Members of a designated group) who own more than fifty percent (50%) of the Voting Membership Interests (or Voting Membership Interests of the designated group) entitled to vote on the applicable matter.

"Member" means each Person designated as a member on Schedule A, attached hereto and made a part hereof, any successor or successors to all or any part of any such Person's Membership Interest in the Company, or any additional member admitted as a member of the Company in accordance with Section 7.5, each in the capacity as a member of the Company. "Members" means all such Persons collectively in their capacity as members of the Company.

"Member Nonrecourse Debt" shall have the same meaning as the term "partner nonrecourse debt" in Section 1.704-2(b)(4) of the Treasury Regulations.

5

"Member Nonrecourse Debt Minimum Gain" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a nonrecourse liability, determined in accordance with Section 1.704-2(i)(3) of the Treasury Regulations.

"Member Nonrecourse Deductions" shall have the same meaning as the term "partner nonrecourse deductions" in Sections 1.704-2(i)(1) and 1.704-2(i)(2) of the Treasury Regulations.

"Member Representations" shall have the meaning set forth in Section 7.7(c).

"Membership Interest" means a membership interest of a Member in the Company representing a fractional part of the aggregate interests in Profits, Losses and Distributions of the Company held by all Members and shall include Class A Interests, Class B Interests and Class C Interests; provided, that any class or group of Membership Interests issued shall have the relative rights, powers and duties set forth in this Agreement. The current Membership Interests are set forth on the attached Schedule A, which is subject to adjustment by the Board of Managers to reflect transactions entered into in accordance with this Agreement.

"New Securities" shall have the meaning set forth in Section 5.2.

"Nonrecourse Deductions" shall have the meaning set forth in Treasury Regulations Section 1.704-2(b)(1).  The amount of Nonrecourse Deductions for a Taxable Year of the Company equals the net increase, if any, in the amount of Company Minimum Gain during that Taxable Year, determined according to the provisions of Treasury Regulations Section 1.704¬2(c).

"OFAC" means the United States Treasury Department's Office of Foreign Assets Control.

"OFAC Prohibited Person" means a person (i) that is listed in the Annex to, or is otherwise subject to the provisions of, Executive Order 13224 issued on September 24, 2001 (EO13224), (ii) whose name appears on OFAC's most current list of "Specifically Designated National and Blocked Persons" (which list may be published from time to time in various mediums including the OFAC website, http:www.treas.gov/ofac/t11sdn.pdf), (iii) who commits, threatens to commit or supports "terrorism", as that term is defined in EO13224, or (iv) who is otherwise affiliated with any person listed above.

"Other Appointees" shall have the meaning set forth in Section 3.3.

"Partnership Representative" shall have the meaning set forth in Section 9.3.

"Perry" means Michael W. Perry, a natural Person.

"Perry Membership Interest" means the Membership Interest of MMPerry Holdings, LLLP as described in and subject to the restrictions of Section 5.4.

6

"Person" means any individual, partnership, corporation, limited liability company, trust, association, or other legal entity, whether foreign or domestic, and its heirs, executors, administrators, legal representatives, successors and assigns where the context so requires.

"Profits" and "Losses" shall mean, for each Taxable Year of the Company (or other period for which Profit or Loss must be computed) the Company's taxable income or loss determined in accordance with Code Section 703(a), with the adjustments required by the Treasury Regulations including the following:

(i)     all items of income, gain, loss, deduction, or credit required to be stated separately pursuant to Code Section 703(a)(1) shall be included in computing taxable income or loss;

(ii)     any tax-exempt income of the Company, not otherwise taken into account in computing Profit or Loss, shall be included in computing income or loss;

(iii)     any expenditures of the Company described in Code Section 705(a)(2)(B) (or treated as such pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Profit or Loss, shall be subtracted from taxable income or loss;

(iv)     gain or loss resulting from any taxable disposition of Company property shall be computed by reference to the adjusted book value of the property disposed of, notwithstanding the fact that the adjusted book value differs from the adjusted basis of the property for federal income tax purposes;

(v)     in lieu of the depreciation, amortization or cost recovery deductions allowable in computing taxable income or loss for financial statement purposes, there shall be taken into account the methods of depreciation and amortization computed based upon the adjusted book value of the asset for income tax purposes; and

(vi)     notwithstanding any other provision of this definition, any items which are specially allocated pursuant to Section 6.6 hereof shall not be taken into account in computing Profit or Loss.

"Purchase Amount" shall have the meaning set forth in Section 5.7(c).

"Public Offering" means any underwritten sale of common equity of the Company or a successor thereto ("Common Equity") pursuant to an effective registration statement under the Securities Act filed with the Securities and Exchange Commission on Form S-1 or S-3 (or any successor form adopted by the Securities and Exchange Commission); provided that the following shall not be considered a Public Offering:  (i) any issuance of Common Equity as consideration for a merger or acquisition and (ii) any issuance of Common Equity or rights to acquire Common Equity to employees, officers, directors, consultants or other service providers of or to the Company or its Subsidiaries as part of an incentive or compensation plan.

"Qualified Holder" shall have the meaning set forth in Section 5.7(a).

"RDB" means RDB Equities Limited Partnership, a Florida limited partnership.

"Regulatory Allocations" shall have the meaning set forth in Section 6.6(j).

"Response Period" shall have the meaning set forth in Section 5.7(c).

"Reverse Waterfall Priority" means, to the extent proceeds are received by Members, with respect to any applicable escrow, holdback, indemnification, expense or other obligation, such item shall be borne by such Members in the reverse order as to which Distributions are made pursuant to Section 6.3(a) such that Members having the lowest priority of Distributions with respect to the applicable Membership Interests shall bear such item first (on a pro rata basis among all other Members having the same priority of Distributions based on the number of Membership Interests held by such Members having such priority).

"Sale Notice" shall have the meaning set forth in Section 7.2(a).

"Sale of the Company" means any of (a) a sale of Membership Interests in which one Person, or more than one Person acting in concert, which Persons did not previously own a Membership Interest in the Company, acquire more than fifty percent (50%) of the Membership Interests, (b) a merger, consolidation or other transaction in which one Person, or more than one Person acting in concert, which Persons did not previously own a Membership Interest, acquire more than 50% of the Membership Interests, or (c) the sale, liquidation or other disposition of all or substantially all of the assets of the Company to an unaffiliated third party.

"Securities Act" means the Securities Act of 1933, as amended.

"Senior Credit Agreement" means that certain Credit Agreement dated July 2, 2015 by and among certain of the Company's Subsidiaries, Texas Capital Bank, National Association, as Administrative Agent, and the lenders from time to time party thereto, as amended, supplemented or restated from time to time (i) on or prior to the date hereof, including pursuant to the Limited Waiver and First Amendment to Credit Agreement dated on or about the date hereof and (ii) hereafter in accordance with the terms and conditions hereof.

"SLG" means SLG LSI Investment, LLC, a Delaware limited liability company.

"SLG Appointee" shall mean any Manager who is designated as an "SLG Appointee" by SLG on the books and records of the Company from time to time pursuant to Section 3.2(a)(i).

"SLG Appointee Votes" shall have the meaning set forth in Section 3.3.

"St. Louis" means James S. St. Louis, a natural Person.

"St. Louis Membership Interest" means the Membership Interest of St. Louis as described in and subject to the restrictions of Section 5.4.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or business entity of which (i) if a corporation, a majority of

8

the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof or (ii) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of limited liability company, partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by any Person or one or more Subsidiaries of that Person or a combination thereof.  For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a limited liability company, partnership, association or other business entity (other than a corporation) if such Person or Persons shall be allocated a majority of limited liability company, partnership, association or other business entity gains or losses or shall be or control any managing member or general partner of such limited liability company, partnership, association or other business entity.  For purposes hereof, references to a "Subsidiary" of any Person shall be given effect only at such times that such Person has one or more Subsidiaries, and, unless otherwise indicated, the term "Subsidiary" refers to a Subsidiary of the Company.

"Supermajority Board Approval" shall mean (a) the affirmative vote of (i) at least a majority of the SLG Appointees and (ii) at least a majority of the Other Appointees or (b) a written consent by such Managers pursuant to Section 3.3 in lieu thereof.

"Tag-Along Interests" shall have the meaning set forth in Section 7.2(a).

"Taxable Year" means the taxable year of the Company as determined under the applicable provisions of the Code and Treasury Regulations.

"Transaction Documents" shall have the meaning set forth in Section 10.6(b).

"Transferring Member" shall have the meaning set forth in Section 7.2(a).

"Transfers" means the direct or indirect sale, transfer, conveyance, assignment, pledge, hypothecation, mortgage or other encumbrance or disposition of all or any part of a Membership Interest, other equity interest in a Person, or other right or property of a Person, as the case may be.  The terms "Transferee," "Transferred," and other forms of the word "Transfer" shall have correlative meanings.  Upon any Transfer of any equity interest in any Member formed for the purpose of making an investment in the Company (or any predecessor) or for which the Membership Interests held by such Member constitute all or substantially all of the assets of such Member, such Member shall be deemed to have indirectly Transferred a portion of each class of Membership Interests held by such Member in an amount equal to the proportion of the equity interest in such Member that has been Transferred.

"Treasury Regulations" means the regulations promulgated by the Department of the Treasury under the provisions of the Code, as amended from time to time.

"Unvested Class C Interests" means, with respect to any Class C Interest that is subject to vesting pursuant to the applicable restricted security agreement, restricted membership interest

agreement, membership interest purchase agreement, option agreement or any similar agreement pursuant to which they were issued, any Class C Interests that are not Vested Class C Interests.

"Vested Class C Interests" means Class C Interests which have vested in accordance with the terms of the restricted security agreement, restricted membership interest agreement, membership interest purchase agreement, option agreement or any similar agreement pursuant to which such Class C Interests were issued.

"Voting Membership Interests" means the Class A Interests and the Class B Interests.

1.2     Other Definitions.  In addition to the terms defined in Section 1.1 hereof, certain other terms are defined elsewhere in this Agreement, and whenever such terms are used in this Agreement, they shall have their respective defined meanings, unless the context expressly or by necessary implication otherwise requires.

1.3     Incorporation By Reference.  All of the Exhibits and Schedules attached, or which could be attached in the future, hereto by agreement of the Members are incorporated by reference and shall be deemed to be a part of this Agreement.

## ARTICLE 2
## Continuation of the Company

2.1     Authorized Persons.  A former officer of the Company, as an authorized person within the meaning of the Act, executed, delivered and filed the Certificate with the Secretary of the State of Delaware, whereupon his powers as an "authorized person" ceased.  The existence of the Company as a separate legal entity shall continue until cancellation of the Certificate as provided in this Agreement and under the Act.

2.2     Principal Place of Business.  The principal place of business of the Company currently is 5332 Avion Park Dr., Tampa, FL 33607.  The Company may locate its principal place of business at any other place or places as the Board of Managers may from time to time deem necessary or advisable.

2.3     Registered Office and Registered Agent.  The Company's current registered office and the name of its registered agent is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle, Delaware 19801.  The Board of Managers may, from time to time, change the registered agent or office of through appropriate filings with the Delaware Secretary of State.  If the registered agent ceases to act as such for any reason or the registered office shall change, the Board of Managers shall promptly designate a replacement registered agent or file a notice of change of address as the case may be.

2.4     Term.  The term of existence of the Company shall be perpetual unless the Company's existence is earlier terminated in accordance with either the provisions of this Agreement or the Act.

2.5     Purposes and Powers.

(a)     The purposes of the Company are, directly or indirectly through one or more Subsidiaries, (i) to lease, manage, and operate medical surgery centers and clinics, including the Centers, and provide certain medical and ancillary health care services at such surgery centers and clinics; (ii) to provide consulting, management and other services, including marketing expertise, to health care businesses, and to invest in such health care businesses when deemed appropriate by the Board of Managers, (iii) to enter into, from time to time, such financial arrangements as the Board of Managers may determine to be necessary, appropriate or advisable (including borrowing money and issuing evidences of indebtedness and securing the same by mortgage, deed of trust, security interest or other encumbrance upon one or more or all of the Company assets); (iv) to sell, assign, lease, exchange or otherwise dispose of, or refinance or additionally finance, one or more or all of the Company assets, including Subsidiaries and the assets of Subsidiaries; and (iv) generally to engage in such other activities and to do any and all other acts and things that the Board of Managers deems necessary, appropriate or advisable from time to time in furtherance of the purposes of the Company as set forth in the foregoing subsections of this Section 2.5.

(b)     The Company shall have any and all powers which are necessary or desirable to carry out the foregoing purposes and business of the Company, to the extent the same may be legally exercised by limited liability companies under the Act.  The Company shall carry out the foregoing activities pursuant to the arrangements set forth in the Certificate and this Agreement.

**ARTICLE 3**
**Management**

3.1     Management by Board of Managers.  Except as otherwise provided in this Agreement, the powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under, the Board of Managers, which shall collectively have the right and power to bind the Company, subject to the rights, obligations, limitations and duties set forth in this Agreement.  Subject to the other provisions of this Agreement, the Board of Managers may exercise all such powers of the Company and do all such lawful acts and things as are permitted to be exercised or done by the Board of Managers by the Act, the Certificate and this Agreement; provided, that the Company shall not take any of the following actions without Board Approval:

(a)     do any act in contravention of this Agreement;

(b)     possess Company property or assign the right of the Company or its Members in specific Company property for other than a Company purpose;

(c)     make, execute, or deliver any general assignments for the benefit of creditors, or any bond, guaranty, indemnity bond, or surety bond;

11

(d)     assign, transfer, pledge, compromise or release any claim of the Company except for full payment therefor, or arbitrate, or consent to the arbitration of, any of its disputes or controversies;

(e)     expend any amount, or execute or enter into, on behalf of the Company, any note, contract, promise to pay, or other obligation having an aggregate value in excess of Three Hundred Thousand Dollars ($300,000);

(f)     purchase, lease or sell any single asset or property having an aggregate fair market value exceeding Three Hundred Thousand Dollars ($300,000);

(g)     sell all or substantially all of the assets of the Company;

(h)     pay salaries, benefits, or other compensation or remuneration to any Member or any Person in which a Member has an interest, or any employee or class of employees of the Company designated by the Board of Managers;

(i)     amend this Agreement or the Certificate;

(j)     permit any mortgage or other encumbrances on the Company's property;

(k)     confess a judgment, make any bankruptcy filing or take other action by the Company seeking protection from its creditors;

(l)     open a facility that provides the same or similar surgical or clinical services as those offered in the Centers in a state or country in which neither the Company nor any of its Subsidiaries currently conducts business;

(m)     dissolve the Company;

(n)     sell, convey, transfer or exchange any Company property other than in the ordinary course of business;

(o)     issue or sell additional Membership Interests;

(p)     make any Distribution;

(q)     procure Company financing (including renewals, modifications or extensions thereto) or refinancing (whether interim, permanent or otherwise) in excess of Three Hundred Thousand Dollars ($300,000) other than purchase money financing; or

(r)     take any action relating to or affecting a Subsidiary of the type described in clauses (a) through (q) of this Section 3.1.

Notwithstanding the foregoing, in no event shall any individual member of the Board (including the Chairman), in such member's capacity as such, have any

12

right, power or authority to take any action or incur any expense on behalf of, or bind, the Company or any of its Subsidiaries without Board Approval.

3.2     Composition and Election of Board of Managers.

(a)     Number and Appointment.  The Board shall initially consist of eleven (11) Managers (subject to any increase or decrease (x) approved by the Board; provided, that no such reduction shall reduce the number of Managers below the number who have a right under this Section 3.2(a) to be in office or (y) resulting from a reduction in the number of Managers pursuant to this Section 3.2(a)).  The Board shall at all times be comprised of the following persons:

(i)     for so long as SLG and/or its Affiliates hold in the aggregate at least 3,464.693902042 Voting Membership Interests, SLG shall have the right to appoint three (3) Managers, who shall initially be Jonathan B. Lewis and Sean Dempsey (and one such seat shall be vacant); provided, that, (A) if SLG and/or its Affiliates hold in the aggregate less than 3,464.693902042 Voting Membership Interests, such number shall be reduced to two (2) Managers, (B) if SLG and/or its Affiliates hold in the aggregate less than 2,309.795934695 Voting Membership Interests, such number shall be reduced to one (1) Manager and (C) if SLG and/or its Affiliates hold in the aggregate less than 461.959186939 Voting Membership Interests, SLG shall not have any rights pursuant to this subsection (i) (such Managers appointed by SLG, the "SLG Appointees"); provided, further, that each number of Voting Membership Interests set forth in this Section 3.2(a)(i) shall be subject to adjustment to reflect any subdivision (by Voting Membership Interest split or otherwise) or any combination (by reverse Voting Membership Interest split or otherwise) of any outstanding Voting Membership Interests occurring on or after the date hereof;

(ii)     for so long as EFO and/or its Affiliates hold in the aggregate at least 50% of the number of Voting Membership Interests held by EFO as of the date hereof, EFO shall have the right to appoint two (2) Managers, who shall initially be William Esping and Robert Grammen; provided, that, (A) if EFO and/or its Affiliates hold in the aggregate less than 50% of such Voting Membership Interests held by EFO as of the date hereof, such number shall be reduced to one (1) Manager and (B) if EFO and/or its Affiliates hold in the aggregate less than 10% of such Voting Membership Interests held by EFO as of the date hereof, EFO shall not have any rights pursuant to this subsection (ii);

(iii)     for so long as Horne Management and/or its Affiliates hold in the aggregate at least 50% of the number of Voting Membership Interests held by Horne Management as of the date hereof, Horne Management shall have the right to appoint one (1) Manager, who shall initially be William Horne;

(iv)     for so long as CTS and/or its Affiliates hold in the aggregate at least 50% of the number of Voting Membership Interests held by CTS as of the

13

date hereof, CTS shall have the right to appoint one (1) Manager, who shall initially be Christopher Sullivan;

(v)     for so long as DBF and/or its Affiliates hold in the aggregate at least 50% of the number of Voting Membership Interests held by DBF as of the date hereof, DBF shall have the right to appoint one (1) Manager, who shall initially be Geza Henni;

(vi)     for so long as RDB and/or its Affiliates hold in the aggregate at least 50% of the number of Voting Membership Interests held by RDB as of the date hereof, RDB shall have the right to appoint one (1) Manager, who shall initially be Robert Basham; and

(vii)   Dr. James St. Louis and Dr. Robert Perry shall each serve as a Manager until his or her earlier resignation, death or removal by Supermajority Approval of the Board.

(b)     Term.   Each Manager shall serve until a successor is appointed in accordance with the terms hereof or his or her earlier resignation, death or removal in accordance herewith.  A person shall become a Manager effective upon receipt by the Company of a written notice (or at such later time or upon the happening of some other event specified in such notice) of such person's designation from the Person or Persons entitled to designate such Manager pursuant to Section 3.2(a); provided, that the persons identified in Section 3.2(a) by name shall become Managers effective upon the date hereof.  Managers need not be Members and need not be residents of the State of Delaware.

(c)     Removal and Resignation.  Whenever a Member is entitled to elect one or more Managers by the provisions of Section 3.2(a), a Manager or Managers so elected may be removed only by the vote of such Member and not by the vote of the Managers or Members as a whole (except as provided in clause (1) of this Section 3.2(c)).  A Manager may resign as such by delivering his or her written resignation to the Company at the Company's principal office addressed to the Board.  Such resignation shall be effective upon receipt unless it is specified to be effective at some other time or upon the happening of some other event.  If any Member loses the right to appoint one or more Managers pursuant to Section 3.2(a), then (1) such Member shall cause such Manager(s) to resign as promptly as practicable and, without limitation of the foregoing, such Manager may be removed by Board Approval (without counting the vote of such Manager) and (2) unless otherwise approved by Board Approval, the size of the Board shall be reduced to reflect the removal or resignation of such Manager(s).  Newly created positions on the Board resulting from any increase in the authorized number of Managers may be filled by the mutual agreement of (i) the majority vote of the SLG Appointees and (ii) the majority vote of the then-current Other Appointees.

(d)     Vacancies.  In the event that any Manager designated pursuant to Section 3.2(a) for any reason ceases to serve as a member of the Board or a committee during his

or her term of office and the Member designating such Manager retains the right to appoint a replacement therefor, the resulting vacancy on the Board or such committee may be filled only in the manner specified in Section 3.2(a) except in the case of a reduction in the number of Managers on the Board.

(e)　Committees.  The Board shall have the power and right, but not the obligation, to create and disband committees of the Board and to determine the duties, responsibilities, powers and composition thereof; provided, that unless otherwise approved by a majority of the Other Appointees, each such committee shall include at least two Other Appointees.

3.3　Meetings of the Board of Managers and Actions by Written Consent.

(a)　Voting.  Each member of the Board of Managers other than any Manager that is an SLG Appointee (the "Other Appointees") shall have the power to cast one (1) vote on all matters brought before the Board of Managers.  For so long as SLG has the right to appoint three (3) SLG Appointees, (i) the SLG Appointees collectively shall have the power to cast a number of votes equal to the number of votes cast by all of the Other Appointees plus one (1) vote (the "SLG Appointee Votes"), regardless of whether all or less than all of the SLG Appointees are in attendance at such meeting and (ii) each SLG Appointee in attendance at any meeting shall be entitled to cast a number of votes equal to the quotient of the number of SLG Appointee Votes divided by the number of SLG Appointees present at such meeting.  At any time when SLG does not have the right to appoint three (3) SLG Appointees, each SLG Appointee shall only be entitled to cast one (1) vote on all matters brought before the Board of Managers.

(b)　Quorum.  The members of the Board of Managers having a majority of the voting power of the Board of Managers with respect to any item of business must be present in order to constitute a quorum for the transaction of business of the Board of Managers (provided, that a quorum must at all times include at least one (1) SLG Appointee and at least one (1) Other Appointee; provided, further, that if no Other Appointees attend at least two (2) consecutive properly noticed meetings of the Board, then no Other Appointee's attendance shall be required to constitute a quorum thereafter) and, except as otherwise provided in this Agreement, the act of the members of the Board of Managers having a majority of the voting power at a meeting of the Board of Managers at which a quorum is present shall be the act of the Board of Managers.

(c)　Meetings.  Meetings of the Board of Managers and any committee thereof shall be held at the principal office of the Company or at such other place as may be determined by the Board of Managers or such committee. Regular meetings of the Board of Managers shall be held not less frequently than on a calendar quarter basis (unless any such quarterly meeting shall be waived by Supermajority Board Approval) on such dates and at such times as shall be determined by the Board of Managers. Up to one special meeting of the Board of Managers may be called by any two Managers per calendar quarter (and all other special meetings, if any, may be called only by an SLG Appointee) and special meetings of any committee may be called by one SLG Appointee on such

15

committee. Notice of each special meeting of the Board of Managers or committee stating the date, place and time of such meeting shall be given to each member of the Board of Managers (in the case of a Board of Managers meeting) or each member of the Board of Managers on such committee (in the case of a committee meeting) by hand, telecopy, electronic mail or overnight courier at least forty-eight (48) hours prior to such meeting to such address (or electronic mail address) on file with the Company.  Notice of each regular meeting of the Board of Managers shall be given to each member of the Board of Managers in the same manner at least ten (10) business days prior to such meeting, unless the date, time and place of such meeting was determined at the previous regular meeting of the Board of Managers and any Managers absent from such previous regular meeting are provided such date, time and place of the next regular meeting reasonably promptly following such previous regular meeting.  Notice may be waived before or after a meeting or by attendance without protest at such meeting. The actions taken by the Board of Managers or any committee at any meeting (as opposed to by written consent), however called and noticed, shall be as valid as though taken at a meeting duly held after regular call and notice if (but not until), either before, at or after the meeting, each of the members of the Board of Managers as to whom it was improperly called sign a written waiver of notice or a consent to the holding of such meeting or an approval of the minutes thereof.

(d)      Actions by Written Consent.  The actions by the Board of Managers or any committee thereof may be taken by vote of the Board of Managers or any committee at a meeting thereof or by written consent (without a meeting, without notice and without a vote) so long as such consent is signed by at least the members of the Board of Managers holding the number of votes that would be necessary to authorize or take such action at a meeting of the Board of Managers or such committee in which all members of the Board of Managers then serving on the Board of Managers or such committee, as the case may be, were present; provided, that any such written consent of the Board of Managers or such committee is signed by at least one Other Appointee; provided, further, that prompt notice of the action so taken without a meeting shall be given to those members of the Board of Managers or such committee who have not consented in writing.

(e)      Means of Conducting Meetings.  A meeting of the Board of Managers or any committee thereof shall permit attendance via telephone conference or similar communications equipment by means of which all individuals participating in the meeting can be heard and such communication option shall be made available for all meetings unless otherwise approved by Supermajority Board Approval.  The Board of Managers and any committee thereof may adopt such other reasonable procedures governing meetings and the conduct of business at such meetings as it shall deem appropriate that are consistent with this Agreement.

(f)      Voting by Proxy. Each Manager entitled to vote at a meeting of the Board of Managers or any committee thereof may do so either in person or by designating a proxy pursuant to advance written notice to all of the other Managers executed by such Manager (which written notice may be transmitted electronically).   Any proxy so

16

designated shall have full authority to vote (at meetings or by executing written consents) on all matters that may come before the Board of Managers or any applicable committee thereof, subject to any limitations or qualifications set forth in such written notice. Any action taken by a person acting pursuant to such a proxy shall for all purposes of this Agreement be deemed to have been taken by the Manager who appointed such proxy (including, for example, for purposes of determining whether any approval of the Board of Managers constitutes Supermajority Board Approval).

3.4    Officers.  The Board of Managers shall have the right to appoint officers of the Company and to delegate management authority to conduct the day-to-day business and affairs of the Company to such officers.

(a)    The officers of the Company may consist of a chairman, chief executive officer, a president, a chief financial officer, a chief compliance officer, a secretary and such other offices as the Board of Managers determines to be in the best interests of the Company.  Each officer shall have such duties and responsibilities as are designated by the Board of Managers.  In addition, unless the Board of Managers decides otherwise, if the title given to such officer is one commonly used for officers of a limited liability company or business corporation formed under the Delaware General Corporation Law or the Act, the assignment of such title shall constitute the delegation to such Person of the authorities and duties (including fiduciary duties) that are normally associated with that office for such a corporation.  Each officer shall hold office until the officer's successor is appointed and approved, or until the officer's earlier death, Disability, resignation, or removal in the manner hereinafter provided.  Any two or more offices may be held by the same Person, it being understood and agreed that only individuals may be officers.  The Board of Managers may leave unfilled any office in the Board of Managers' discretion.  Appointment of an officer or agent shall not of itself create contract rights between the Company and that officer or agent.  The following persons are hereby designated as the following officers of the Company:

(i)    The Chairman of the Company shall be William Horne so long as he is a Manager (provided, that, notwithstanding the foregoing in this Section 3.4, unless otherwise determined by the Board of Managers in writing after the date hereof, the Chairman of the Company shall not have any right, power or authority to take any action or incur any expense on behalf of, or bind, the Company or any of its Subsidiaries).

(ii)    The Chief Executive Officer of the Company shall initially be David Pillsbury, who shall hold office until his successor is appointed and approved, or until his earlier death, Disability, resignation, or removal in accordance herewith.

(iii)    The Chief Financial Officer of the Company shall initially be Alan Campbell, who shall hold office until his successor is appointed and approved, or until his earlier death, Disability, resignation, or removal in accordance herewith.

17

(iv)     The Secretary of the Company shall initially be Chris Knopik, who shall hold office until his successor is appointed and approved, or until his earlier death, Disability, resignation, or removal in accordance herewith.

(b)     Any officer or agent of the Company may be removed by the Board of Managers if in the Board of Managers' judgment, the best interests of the Company would be served thereby, but the removal shall be without prejudice to the contract rights, if any, of the Person so removed.  Any officer of the Company may resign at any time by giving written notice of the resignation to the Board of Managers.  Any resignation shall take effect at the time specified therein or, if the time when it shall become effective is not specified therein, immediately upon its receipt.  The acceptance of a resignation shall not be necessary to make it effective unless otherwise stated in the resignation.

3.5     Power of Attorney.

(a)     Each Member hereby irrevocably and severally appoints and constitutes SLG, its successors and assigns hereunder, as its true and lawful attorney-in-fact, with full power and authority, on its behalf and in its name, to execute, acknowledge, swear to, deliver and, where appropriate, file in such offices and places as may be required by law, any documents necessary to authorize, evidence, and/or effect a sale or transfer of Membership Interests in accordance with the terms of Section 5.4 or Section 7.7.

(b)     The power of attorney granted by each Member to SLG under Section 3.5(a) is a special power coupled with an interest and is irrevocable, and may be exercised by any Person who at the time of exercise is an officer of SLG.  Such power of attorney shall survive the death or Disability of a Member and any Transfers or abandonment of its Membership Interest, or its withdrawal from the Company.  In the event that SLG wishes to invoke this power of attorney, SLG will provide the Member for whom the power is to be invoked written notice of such intention not less than ten (10) days prior to its invocation.

3.6     Liability of Members of the Board of Managers.

(a)     To the maximum extent permitted by applicable law, except as otherwise provided herein or in any agreement entered into by such Person and the Company, no member of the Board of Managers or any of such Person's Affiliates shall be liable to the Company or to any Member or other holder of any interest in the Company for any act or omission performed or omitted by such Person in its capacity as a member of the Board of Managers taken in accordance with such member of the Board of Manager's implied contractual obligation of good faith and fair dealing; provided, that, except as otherwise provided herein, such limitation of liability shall not apply to the extent the act or omission was attributable to such Person's willful misconduct or knowing violation of law or for any breaches of any representations, warranties or covenants by such Person or any of such Person's Affiliates contained herein or in any other written agreement with the Company or any of its Affiliates.  The Board of Managers may exercise any of the powers granted to it by this Agreement and perform any of the duties imposed upon it

18

hereunder either directly or by or through its agents, and, to the maximum extent permitted by applicable law, no member of the Board of Managers or any of such Person's Affiliates shall be responsible for any misconduct or negligence on the part of any such agent appointed by the Board of Managers (so long as such agent was selected in good faith). The Board of Managers shall be entitled to rely upon the advice of legal counsel, independent public accountants and other experts, including financial advisors, and any act of or failure to act by the Board of Managers in good faith reliance on such advice shall in no event subject the Board of Managers or any member thereof to liability to the Company or any Member.

(b)     Notwithstanding any other provision of this Agreement, to the maximum extent permitted by applicable law, whenever the Board of Managers is permitted or required by this Agreement to make a decision, each member of the Board of Managers may consider only those interests and factors that such member of the Board of Managers desires (including its own interests, the interests of its Affiliates and interests and factors that are unrelated to the Company or any Subsidiary thereof), and to the fullest extent permitted by applicable law, is under no duty or obligation to give any consideration to any other interests of, or factors affecting, the Company or its Subsidiaries, the Members, or any other Person or group of Persons.

(c)     Notwithstanding anything to the contrary contained herein, to the maximum extent permitted by applicable law, whenever in this Agreement or any other agreement contemplated herein or otherwise, the Board of Managers is permitted or required to take any action or to make a decision in its "sole discretion" or "discretion," or that it deems "necessary," "necessary or appropriate," "necessary or desirable" or "necessary, appropriate or advisable," or under a grant of similar authority or latitude, the Board of Managers shall, to the fullest extent permitted by applicable law, make such decision in its sole discretion (regardless of whether there is a reference to "sole discretion" or "discretion"), be entitled to consider such interests and factors as it desires (including the interests of a Unitholder with which the Manager may be affiliated), and shall have no duty or obligation (fiduciary or otherwise) to give any consideration to any interest of or factors affecting the Company, its Subsidiaries or the Members, and shall not be subject to any other or different standards imposed by this Agreement, any other agreement contemplated hereby, under the Act or under any other applicable law or in equity.

(d)     To the maximum extent permitted by applicable law, all fiduciary duties of any Manager to the Company or any Member are hereby eliminated. Without limiting the foregoing, each Member hereby waives any claim or cause of action against the present and former Managers, or any of their respective Affiliates, employees, agents, and representatives, for any breach of any fiduciary duty to the Company or its Members by any such Person, including as may result from a conflict of interest between the Company or any of its Subsidiaries and such Person. Subject to compliance with the express terms of this Agreement, a Manager shall not be obligated to recommend or take any action as a Manager that prefers the interests of the Company or any of its Subsidiaries or the other Members over the interests of such Manager or its Affiliates,

19

heirs, successors, assigns, agents or representatives and the Company, and the Members hereby waive all fiduciary duties, if any, of the Board of Managers to the Company and the Members, including in the event of any such conflict of interest.  Notwithstanding the foregoing, nothing herein shall eliminate the implied duties of any Manager or Member of good faith and fair dealing under Delaware law.

(e)     Without limiting the foregoing, each Member hereby (i) ratifies, approves and consents to all actions taken on or prior to the date hereof by each manager of the Company under the Act, the "Board of Managers" (as defined under the Original Agreement and the A&R Agreement, respectively) in connection with (A) the Distribution made to the Members on or about July 6, 2015, (B) the Senior Credit Agreement and the transactions contemplated thereby, (C) the Convertible Bridge Loan Agreement and the transactions contemplated thereby, including the conversion of the loans thereunder into Class A Interests and (D) the Rights Offering and (ii) waives and releases any claim or cause of action against the Company, each other Member, the present and former managers, the Managers and the foregoing Board(s) of Managers, and each of their respective Affiliates, employees, agents, and representatives, including without limitation for any breach of express or implied duty (including any breach of any fiduciary duty) to the Company or any of its Members by any such Person, including as may have resulted from a conflict of interest between the Company or any of its Subsidiaries and such Person, in connection with each of the foregoing.

3.7     Indemnification.

(a)     The Company hereby agrees to indemnify and hold harmless any Person (each, an "Indemnified Person") to the fullest extent permitted under the Act, as the same now exists or may hereafter be amended, substituted or replaced (but, in the case of any such amendment, substitution or replacement only to the extent that such amendment, substitution or replacement permits the Company to provide broader indemnification rights than the Company is providing immediately prior to such amendment), against all expenses, liabilities and losses (including attorneys' fees, judgments, fines, excise taxes or penalties) incurred or suffered by such Person (or one or more of such Person's Affiliates) by reason of the fact that such Person is or was serving as a member of the Board of Managers (or any equivalent governing body) or as an officer of the Company or any of its Subsidiaries (and, in the sole discretion of the Board of Managers, any Person that is or was serving as an employee, consultant or other agent of the Company or any of its Subsidiaries or is or was serving at the request of the Company as a representative, officer, director, principal, member, employee, consultant or other agent of another partnership, corporation, joint venture, limited liability company, trust or other enterprise); provided, that (unless the Board of Managers otherwise consents) no Indemnified Person shall be indemnified for any expenses, liabilities and losses suffered that are attributable to such Indemnified Person's or its Affiliates' willful misconduct or knowing violation of law, or for any breaches of any representations, warranties or covenants by such Indemnified Person or its Affiliates contained herein or in any other agreement with the Company or any of its Subsidiaries.  Expenses, including attorney fees, incurred by any such Indemnified Person in defending a proceeding shall, to the

20

extent of available funds, be paid by the Company in advance of the final disposition of such proceeding, including any appeal therefrom, upon receipt of an undertaking satisfactory to the Board of Managers by or on behalf of such Indemnified Person to repay such amount if it shall ultimately be determined that such Indemnified Person is not entitled to be indemnified by the Company.  The right to indemnification and the advancement of expenses conferred in this Section 3.7 shall be in addition to (and shall not limit) any other right which any Person may have or hereafter acquire under any statute, agreement, vote of the Board of Managers or otherwise.

(b)      The Company shall maintain manager and officer liability insurance (covering each member of the Board of Managers and any officer of the Company and its Subsidiaries), at its expense, with coverage levels and terms and conditions reasonably acceptable to the Board of Managers.  Notwithstanding anything contained herein to the contrary (including in this Section 3.7), any indemnity by the Company relating to the matters covered in this Section 3.7 shall be provided out of and to the extent of Company assets only and no Member (unless such Member otherwise agrees in writing or is found in a final decision by a court of competent jurisdiction to have personal liability on account thereof) shall have personal liability on account thereof or shall be required to make additional Capital Contributions or payments to the Company to help satisfy such indemnity of the Company.

(c)      If this Section 3.7 or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Indemnified Person pursuant to this Section 3.7 to the fullest extent permitted by any applicable portion of this Section 3.7 that shall not have been invalidated and to the fullest extent permitted by applicable law.

3.8      Limitations on Authority of Board.

(a)      Notwithstanding anything to the contrary in this Agreement, neither the Company nor any of its Subsidiaries shall take any of the following actions (or enter into any commitment to take any of the following actions) without first obtaining Supermajority Board Approval (whether by meeting or written consent):

(i)      the payment of any management, consulting, advisory or other fee to SLG or any Affiliate of SLG, or from and after the approval of any such fee arrangement, any modification or waiver thereof;

(ii)      the issuance of any Class C Interests to any employee or partner of Sheridan Legacy Fund I, L.P. (which is the sole member of SLG) or its general partner;

(iii)      any transaction with SLG or an Affiliate of SLG (including any modification or waiver of any existing agreement or transaction) on terms and conditions less favorable to the Company or the applicable Subsidiary than could reasonably expected to be obtained if such transaction were entered into with an

independent third party; <u>provided</u>, that any issuances of Membership Interests in accordance with this Agreement or reimbursement of expenses pursuant to <u>Section 10.12</u> shall not be subject to such approval;

(iv)      a Sale of the Company to an Affiliate of SLG;

(v)      a Sale of the Company to any third party unless the aggregate consideration paid to the Members in connection with such Sale of the Company exceeds the sum of (A) the aggregate Class A Unreturned Capital as of the closing date thereof  plus (B) the aggregate Class A Unpaid Return as of the closing date thereof;

(vi)      enter into or conduct, or permit any Subsidiary to enter into or conduct, any business other than the businesses described in <u>Section 2.5(a)</u> (without taking into account any amendments thereof after the date hereof);

(vii)      amend, restate or otherwise modify the Senior Credit Agreement if the effect thereof would be to (A) change the definition of "Permitted Tax Distributions" as defined in the Senior Credit Agreement on the date hereof or the ability of the Company to make Permitted Tax Distributions as set forth therein or (B) unless the Company is permitted to make Tax Distributions in accordance with <u>Section 6.4</u> (without taking into account the last sentence thereof), extend the maturity date of the obligations thereunder to be later than January 1, 2019; or

(viii)      issue Class C Interests representing in excess of 5% of the fully diluted Membership Interests (without taking into account any Class C Interests issued pursuant to <u>Section 5.7(a)(vi)</u>).

(b)      In no event shall the Board elect to cause the Company to be treated as an entity other than a partnership (or, with respect to the Subsidiaries of the Company, a disregarded entity) for income tax purposes (and not a corporation) without the approval of holders (other than SLG and its Affiliates) of a majority of the Voting Membership Interests held by Members other than SLG and its Affiliates; <u>provided</u>, that such approval shall not be required in connection with a reorganization of the Company in connection with a Public Offering in accordance with <u>Section 7.7(d)</u>.

**ARTICLE 4**
**<u>Meetings of Members</u>**

4.1      <u>Place of Meetings</u>.  All meetings of the Members shall be held at the principal office of the Company or at such other place as may be determined by the Board of Managers and set forth in the respective notice or waivers of notice of such meeting.

4.2      <u>Annual Meetings of Members</u>.  An annual meeting of the Members may be held each year as determined by the Board of Managers for the transaction of such other business as may properly come before such meeting.  Notice of such annual meeting shall be given in the manner as provided in <u>Section 4.4</u> of this Agreement.

22

4.3    Special Meetings of Members.  Special meetings of the Members may be called (a) by the Board of Managers, (b) by the holder or holders of not less than fifteen percent (15%) of all the Membership Interests up to one time per calendar quarter (unless a special meeting of the Board of Managers that was called by an Other Appointee occurred during such calendar quarter, in which case such right to call a meeting shall not apply with respect to such calendar quarter), or (c) as otherwise specifically permitted by this Agreement.  Any business transacted at all special meetings shall be confined to the purposes stated in the notice of such special meetings, as further provided in Section 4.4 of this Agreement.

4.4    Notice of Annual & Special Meetings of Members.  Written or printed notice stating the place, day and hour of the meeting and, in the case of special meetings, the purpose or purposes for which the meeting is called, shall be delivered not less than ten (10) nor more than sixty (60) days before the date of the meeting, either personally or by mail, by or at the direction of the Board of Managers or Person(s) calling the meeting, to each Member of record entitled to vote at such meeting.  If mailed, such notice shall be deemed to be delivered when deposited in the United States mail addressed to the Member at its address as it appears on the transfer records of the Company, with postage prepaid.

4.5    Quorum.  A Majority in Interest, whether in person or by proxy, of the Members shall constitute a quorum at all meetings of the Members, except as otherwise provided by law or the Certificate.  Once a quorum is present at the meeting of the Members, the subsequent withdrawal from the meeting of any Member prior to adjournment or the refusal of any Member to vote shall not affect the presence of a quorum at the meeting.  If, however, a quorum shall not be present at any meeting of the Members, the Members entitled to vote at such meeting shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until the holders of the requisite amount of Membership Interests shall be present or represented.  At any meeting of the Members at which a quorum is present, the vote of the holders of a Majority in Interest of all the Members shall be the act of the Members, unless the vote of a different number is required by law, the Certificate, or this Agreement.

4.6    Voting on General Matters.  Except as otherwise set forth in this Agreement or the Certificate, for purposes of voting on matters, an amendment of this Agreement, or any other matter for which the affirmative vote of the holders of a specified portion of the Voting Membership Interests entitled to vote is required by the Act or this Agreement, at any meeting of the Members at which a quorum is present, the act of the Members shall be the affirmative vote of the holders of a Majority in Interest of all Members present, either in person or by proxy.

4.7    List of Members Entitled to Vote.  The Board of Managers shall make, at least ten (10) days before each meeting of Members, a complete list of the Members who are entitled to vote at such meeting, or any adjournment of such meeting, arranged in alphabetical order, with the address of and the Membership Interest held by each Member, which list, for a period of ten (10) days prior to such meeting, shall be kept on file at the registered office of the Company and shall be subject to inspection by any Member at any time during usual business hours.  Such list shall also be produced and kept open at the time and place of the meeting and shall be subject to inspection of any Member during the whole time of the meeting.  However, failure to comply

23

with the requirements of this Section shall not affect the validity of any action taken at such meeting.

4.8  Voting Power.  Each holder of a Class A Interest and/or a Class B Interest shall be entitled to one vote with respect to such Class A Interest or a Class B Interest, as the case may be.  No holder of a Class C Interest shall be entitled to vote with respect to such Class C Interests.

4.9  Registered Members.  The Company shall be entitled to treat the holder of record (as reflected on the Company's records) of any Membership Interest as the holder in fact of such Membership Interest for all purposes, and accordingly shall not be bound to recognize any equitable or other claim to or interest in such Membership Interest on the part of any other Person, whether or not it shall have express or other notice of such claim of interest, except as expressly provided by this Agreement or the laws of the State of Delaware.

4.10  Actions Without a Meeting and Telephone Meetings.  The actions by the Members entitled to vote or consent may be taken by vote of the Members entitled to vote or consent at a meeting or by written consent (without a meeting and without a vote) so long as such consent is signed by the Members having not less than the minimum number of Membership Interests that would be necessary to authorize or take such action at a meeting at which all Members entitled to vote thereon were present and voted.  Meetings of the Members shall permit attendance via telephone conference or similar communications equipment by means of which all individuals participating in the meeting can be heard.

4.11  Deemed Approval of the Members.  Notwithstanding any language to the contrary in this Agreement, if and to the extent an action of the Company or other matter involving the Company requires the approval of a Majority in Interest of the Members under the terms of this Agreement, the Board of Managers may deem a failure to respond of a Member within the time period specified in the Board of Managers' notice to the Members requesting the Members' approval of the action or matter as the Member's approval to proceed in the manner recommended by the Board of Managers, provided, that (a) the time period for a response by the Members specified in the Board of Managers' notice shall not be less than ten (10) days nor more than sixty (60) days and (b) the Board of Managers' notice to the Members shall state that the failure of a Member to respond within the specified period shall constitute the deemed approval of the Member to the requested action or matter.

### ARTICLE 5
### Members; Membership Interests

5.1  Membership Interests.

(a)  All Membership Interests shall be uncertificated unless otherwise determined by the Board of Managers.  The ownership by a Member of Membership Interests shall entitle such Member to allocations of Profits and Losses, Distributions and all other rights and obligations as set forth in this Agreement.

24

(b)    As of the date hereof, each Member's aggregate Membership Interest outstanding under the A&R LLC Agreement is hereby, without further action of any Person, converted into that number of Class B Interests set forth opposite such Member's name on Schedule A hereto.

5.2    Issuance of Additional Membership Interests.

(a)    The Company has outstanding approximately $50,250,002 of convertible loans that are convertible into an aggregate 6,620 Class A Interests pursuant to the terms and conditions of the Convertible Bridge Loan Agreement.  For purposes of this Agreement, other than Article VI, each Member who has made a bridge loan to the Company pursuant to the Convertible Bridge Loan Agreement shall be deemed to hold the Class A Interests issuable upon conversion of such loans.

(b)    The Company has offered (or will offer after the date hereof) certain Members other than SLG the right to purchase up to 1,284.478363456 additional Class A Interests pursuant to a rights offering, to be completed on or before December 31, 2016 or such later date as determined by the Board of Managers (the "Rights Offering").

(c)    Subject to Sections 3.8, 5.7 and 10.5, the Board of Managers shall have the right to cause the Company to issue any of the following (collectively, "New Securities"): (i) additional Membership Interests or other interests in the Company (including creating other classes or series thereof having different rights), (ii) obligations, evidences of indebtedness or other securities or interests convertible or exchangeable into Membership Interests or other interests in the Company and (iii) warrants, options or other rights to purchase or otherwise acquire Membership Interests or other interests in the Company.

(d)    Upon any issuance pursuant to this Section 5.2, the Board of Managers shall have the power and authority to amend Schedule A to reflect such additional issuances.

5.3    No Interest on Capital Contributions.  Members shall not be paid interest on their Capital Contributions.

5.4    Noncompetition by St. Louis, Perry and Hamburg and Forfeiture of Granted Membership Interests.  St. Louis, Perry and Hamburg understand that their Granted Membership Interests are subject to forfeiture if they engage in activities that compete with the Business of the Company as provided below.

(a)    At no time while a Member, or while Employed by the Company or a Subsidiary of the Company, and for a period of two (2) years after the later to occur of Member dissociation or Employment termination (the "Non-Competition Period"), may St. Louis, Perry, or Hamburg, engage in activities that compete with the Business (hereinafter defined) of the Company within the continental United States of America or any other location outside the United States in which the Company or one of its

25

Subsidiaries is conducting its business (the "Competitive Activities").  Any Competitive Activities of St. Louis, Perry, or Hamburg, during the Non-Competition Period, shall subject his or their Granted Membership Interest to forfeiture at election of the Company, which forfeiture shall be triggered by the exercise of an option by the Company to purchase the St. Louis Membership Interest, the Perry Membership Interest, and/or the Hamburg Membership Interest, as applicable, for a purchase price of one thousand dollars ($1,000) for each of their respective entire Membership Interests (the "Call Option").  The Call Option shall be exercisable by the Company by delivering written notice (the "Call Option Notice") to the applicable physician who is in violation of this Section 5.4 (the "Breaching Member"), stating that the Company has identified his participation in Competitive Activities, stating in reasonable detail the basis upon which the Company believes that he is in competition with the Business of the Company, and notifying the Breaching Member of the Company's exercise of its Call Option and intent to purchase the entire Membership Interest of the applicable Breaching Member, for a total price equal to one thousand dollars ($1,000) for the applicable Breaching Member's entire Membership Interest.  The closing of the Call Option shall occur within forty-five (45) days of the date the Company issued the Call Option Notice.  If the applicable Breaching Member fails to sell his respective Membership Interest to the Company upon its exercise of the Call Option as set forth in this Section 5.4, the Board of Managers may take such action on behalf of such Member pursuant to Section 3.5.

(b)     For purposes of this Section 5.4, the "Business" of the Company shall be strictly defined as the practice of minimally invasive spinal surgery as practiced by physicians at the Center or Centers during the period of time the Member in question was a Member of the Company.

(c)     None of the foregoing non-competition provisions shall be interpreted to limit or otherwise proscribe the ability of any of St. Louis, Perry, or Hamburg, to practice medicine that does not compete with the Business of the Company anywhere in the United States.

(d)     In the event of Competitive Activities during the Non-Competition Period by St. Louis, Perry, or Hamburg, in addition to the Call Option described above in subsection (a), the Company may pursue all other remedies available to it, including an action to enjoin the Competitive Activities, as well as an action asserting claims for any damages, fees (including reasonable attorneys' fees), costs, or expenses suffered by the Company as a result of the Competitive Activities, or incurred as a result of bringing any lawsuit or other action in connection with the Competitive Activities.

5.5     Confidentiality.

(a)     The Members agree not to disclose or permit the disclosure of any of the terms of this Agreement or of any other confidential, non-public or proprietary information relating to the business of the Company or its Subsidiaries (collectively, "Confidential Information"), provided that such disclosure may be made (i) to any Person who is a Member, a partner, officer, director or employee of such Member or counsel to

or accountants of such Member or the Company, solely for their use and on a need-to-know basis, provided that such Persons are notified of the Members' confidentiality obligations hereunder, (ii) with the prior consent of the Board of Managers, (iii) subject to the next paragraph, pursuant to a subpoena or order issued by a court, arbitrator or governmental body, agency or official, (iv) in connection with and to the extent necessary, to any lender providing financing to the Company or its Subsidiaries.

(b)    In the event that a Member shall receive a request to disclose any Confidential Information under a subpoena or order, such Member shall (i) promptly notify the Board of Managers, (ii) consult with the Board of Managers on the advisability of taking steps to resist or narrow such request and (iii) if disclosure is required or deemed advisable, cooperate with the Board of Managers in any attempt it may make to obtain an order or other assurance that confidential treatment will be accorded the Confidential Information that is disclosed.

(c)    Upon the termination any Member's Membership Interest in the Company, such Member shall promptly (i) return to the Company all Confidential Information in such Member's possession or control, including all drawings, manuals, computer printouts, computer diskettes, disks, data, files, lists, memoranda, letters, notes, notebooks, reports and other writings and copies thereof and all other materials relating to the Company's business, including any materials incorporating Confidential Information and (ii) destroy any such Confidential Information and materials that cannot be physically returned.

5.6    Liability of Members.  No Member shall, solely due to status as a Member, be liable for the debts, liabilities or obligations of the Company beyond his, her or its respective Capital Contributions.  No Member shall have any capital commitment or otherwise be required to contribute to the capital of, or to loan the Company any funds.  In addition, notwithstanding anything herein to the contrary, in no event shall, upon liquidation of the Company, any Member with a deficit Capital Account balance be required to contribute to the capital of the Company any amount attributable to such deficit balance.

5.7    Pre-Emptive Rights.

(a)    Pre-Emptive Rights.  If the Company, upon the approval of the Board of Managers, proposes to issue any New Securities ("Proposed New Interests"), then each Class A Holder and Class B Holder who is an "accredited investor" as defined in the Securities Act (each, a "Qualified Holder") may, but shall not be required to, participate in the manner set forth in this Section 5.7, on the same terms and conditions (including price) as are offered in the issuance of the Proposed New Interests giving rise to these pre-emptive rights, by purchasing such portion of Membership Interests as such Qualified Holder elects in accordance with this Section 5.7; provided, that, (y) if the consideration to be received by the Company in the transaction giving rise to the pre-emptive rights is not entirely cash, the value of the non-cash consideration will be determined by the Board of Managers in good faith, and any participating Qualified Holder shall be required to

27

pay the purchase price for its Proposed New Interests solely in cash based on such valuation, and (z) if the Company Notice (defined below) states that it is an all-or-nothing offer, then no Member shall be entitled to participate unless all of the Proposed New Interests are accepted for purchase in the manner set forth in this Section 5.7. Notwithstanding the foregoing, this Section 5.7 shall not apply to, and Proposed New Interests shall not include, (i) additional Membership Interests issued by the Company to institutional lenders who are not Affiliates of SLG in connection with any debt financing provided by such lenders, (ii) additional Membership Interests to the extent issued by the Company as consideration to a Person or its equity holders (none of whom is an Affiliate of SLG) in connection with (A) an acquisition, directly or indirectly, of all or substantially all of such Person's assets or business or (B) the merger into or consolidation with such Person, or any other transaction or series of related transactions in which more than 50% of the voting power of such Person immediately prior to such event is Transferred to the Company or one of its Subsidiaries, (iii) additional Membership Interests issued by the Company in connection with, or after the consummation of, a Public Offering, (iv) additional Membership Interests issued from or pursuant to any incentive or other benefit plan approved by the Board of Managers, (v) Membership Interests issued pursuant to Section 5.2(a) or 5.2(b), (vi) additional Membership Interests issued to one or more plaintiffs or their Affiliates in connection with the settlement of any litigation pending against the Company or any of its Subsidiaries as of the Effective Date or (vii) Membership Interests issued upon conversion or exercise of any security or instrument convertible into or exercisable for Membership Interests, which security instrument is outstanding on the date hereof or is issued hereafter in compliance with this Section 5.7.

(b)     Notice.  Prior to the issuance of Proposed New Interests by the Company, the Company shall give written notice (the "Company Notice") thereof to each Qualified Holder, which Company Notice shall specify (i) the amount of Proposed New Interests being offered to such Members, which for each Member shall be equal to such Member's Pro Rata Pre-Emptive Amount (defined below), (ii) the anticipated closing date, (iii) any other material terms of such issuance, and (iv) whether the offer is an all-or-nothing offer. Each Member's "Pro Rata Pre-Emptive Amount" shall be equal to the quotient obtained by dividing (A) the number of Class A Interests and Class B Interests held by such Member by (B) the number of Class A Interests and Class B Interests held by all Members.

(c)     Exercise.  Each Qualified Holder that wishes to exercise its pre-emptive rights under this Section 5.7 shall deliver a written notice to that effect to the Company within fifteen (15) days after its receipt of the Company Notice to exercise its pre-emptive rights on the same terms and conditions as those offered to the proposed purchaser(s), which notice shall state the dollar amount of Proposed New Interests (which amount shall be no more than such Qualified Holder's Pro Rata Pre-Emptive Amount) that such Member elects to purchase (such portion, the "Purchase Amount"); provided, that, if a Qualified Holder either (i) fails to deliver such notice to the Company within fifteen (15) days after its receipt of the Company Notice (the "Response Period") or (ii) notifies the Company that it elects not to purchase all or any portion of its Pro Rata

28

Pre-Emptive Amount, then such Qualified Holder shall have rejected its pre-emptive right to purchase all or such rejected portion of its Pro Rata Pre-Emptive Amount, as applicable.

(d)      Allocation.  Each electing Qualified Holder shall execute and deliver the applicable documents in connection with the issuance of the Proposed New Interests on the terms set forth in the Company Notice.  The Company shall issue an aggregate number of Proposed New Interests to each Qualified Holder that has given written notice of the exercise of its rights hereunder equal to the Purchase Amount applicable to such Qualified Holder as soon as practicable, and in no event later than the later of (i) ten (10) business days after expiration of the Response Period and (ii) the closing of the issuance of such Proposed New Interests to the proposed purchaser(s); provided, that the Company has, as of such date, received payment from such Member of solely cash consideration for such Proposed New Interests.

(e)      Sale to Third Party.  Upon the expiration of the offering periods described above, the Company shall be entitled to sell such securities that the Qualified Holders have not elected to purchase (or, in the case of an all-or-nothing offer, all of such securities) during the 180 days following such expiration at a price not less than the price set forth in, and on other terms and conditions not more favorable to the purchasers thereof than those set forth in, the Company Notice.  Any securities not sold by the Company after such 180-day period must be reoffered to the Qualified Holders pursuant to the terms of this Section 5.7.

(f)      Syndication.  After receiving all approvals required under this Agreement, the Company may proceed with an issuance of Proposed New Interests covered by this Section 5.7 without first following procedures in Sections 5.7(a) through (d), provided, that (i) the purchaser of such Proposed New Interests agrees in writing to take such Proposed New Interests subject to the provisions of this Section 5.7, and (ii) within fifteen (15) business days following the issuance of such Proposed New Interests, the Company or the purchaser of the Proposed New Interests undertakes steps substantially similar to those in Sections 5.7(a) through (d) above to offer to all Qualified Holders the right to purchase from the Company or such purchaser a pro rata portion of such Proposed New Interests at the same price and terms applicable to the purchaser's purchase thereof so as to achieve substantially the same effect from a dilution protection standpoint as if the procedures set forth in Sections 5.7(a) through (d) had been followed prior to the issuance of such Proposed New Interests.

(g)      No Assignment.  The pre-emptive rights set forth in this Section 5.7 may not be assigned or Transferred, except that such pre-emptive rights may be assigned by any Qualified Holder to any Affiliate of such Qualified Holder.

## ARTICLE 6
### Capital Accounts; Allocations, Distributions

6.1      Capital Accounts.

29

(a)     A separate Capital Account will be maintained for each Member.  As of the date hereof, (x) the Capital Account of each Member (other than a Member who made a Capital Contribution on the date hereof on account of Class A Interests) shall be zero, and (y) the Capital Account of each Member who made a Capital Contribution on the date hereof on account of Class A Interests shall be equal to such Member's Capital Contribution on the date hereof on account of such Class A Interests as reflected on Schedule A.  After the date hereof, each Member's Capital Account will be increased by (i) the amount of money contributed by such Member to the Company plus the amount of any loans under the Convertible Bridge Loan Agreement that convert into Class A Interests; (ii) the fair market value of any property contributed by such Member to the Company (net of liabilities secured by such property that the Company assumes or takes subject to); (iii) the amount of any Company liabilities that are expressly assumed by such Member or that are secured by any Company property distributed to such Member; and (iv) the amount of Profits allocated to such Members.  After the date hereof, each Member's Capital Account will be decreased by (i) the amount of money distributed to such Member by the Company; (ii) the fair market value of any property distributed to such Member by the Company (net of liabilities secured by such property that the Member assumes or takes subject to); (iii) the amount of liabilities of such Member that are expressly assumed by the Company or that are secured by any property contributed by such Member to the Company; and (iv) the amount of losses allocated to such Member.

(b)     In the event of a permitted sale or exchange, in whole or in part of a Membership Interest in the Company, the correct proportion of the Capital Account of the transferor shall become the Capital Account of the transferee to the extent it relates to the transferred Membership Interest.

(c)     The manner in which the Capital Accounts are to be maintained pursuant to this Section 6.1 is intended to comply with the requirements of Code Section 704(b) and the Treasury Regulations promulgated thereunder.

(d)     The Capital Accounts of the Members, for tax purposes, shall be restated or revalued from time to time when appropriate and permitted, so that they are in the same ratio as the Member's respective Membership Interests, in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(f).  Revaluation of the Capital Accounts will cause disparities between the Company's book and tax Capital Accounts and, in such cases, in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(f)(3) & (4), future allocations of depreciation, depletion, amortization, and gain or loss shall be made with reference to book values, and the Members distributive share of the corresponding tax items shall be determined in a manner that takes into account such book/tax disparity using the principles of Section 704(c).

6.2    Allocation of Profits and Losses.  Except as otherwise provided in Section 6.6, Profits and Losses for any Taxable Year (or other allocation period, including the period beginning on the date hereof and ending on December 31, 2016) shall be allocated among the Members in such a manner that, as of the end of such Taxable Year (or other allocation period),

30

the sum of (a) the Capital Account of each Member; (b) such Member's share of minimum gain (as determined according to Treasury Regulation Section 1.704-2(g)); and (c) such Member's partner nonrecourse debt minimum gain (as defined in Treasury Regulation Section 1.704-2(i)(3)) shall be equal to the respective net amount, positive or negative, that would be distributed to such Member or for which such Member would be liable to the Company under this Agreement, determined as if the Company were to (i) liquidate the assets of the Company for an amount equal to their Book Value; and (ii) distribute the proceeds thereof pursuant to Section 6.8.

6.3     Distributions.

(a)     Distributions.  The Board of Managers may (but shall not be obligated to) cause the Company to make Distributions at any time or from time to time.   Any Distribution shall be made in the following order of priority:

(i)     first, to the holders of the Class A Interests (ratably among such holders based upon the aggregate Class A Unpaid Return with respect to all Class A Interests held by each such holder immediately prior to such Distribution), until the aggregate Class A Unpaid Return with respect to such holders' Class A Interests has been reduced to zero;

(ii)     second, to the Class A Holders (ratably among such holders based upon the aggregate Class A Unreturned Capital with respect to all Class A Interests held by each such holder immediately prior to such Distribution), until the aggregate Class A Unreturned Capital with respect to such holders' Class A Interests has been reduced to zero; and

(iii)     third, all remaining amounts to the holders of Class A Interests, Class B Interests and Vested Class C Interests (ratably among such holders based upon the number of Class A Interests, Class B Interests and Vested Class C Interests held by each such holder immediately prior to such Distribution).

For purposes of this Section 6.3(a), no payment of expenses or reimbursement of expenses to any Member or any of their respective Affiliates shall constitute or be deemed to be a Distribution to such Member in making any determination under this Section 6.3(a).   Notwithstanding the foregoing in this Section 6.3(a), (A) a Class C Interest shall be entitled to participate in a Distribution made pursuant to Section 6.3(a)(iii) only if such Class C Interest is a Vested Class C Interest and (B) in the event that one or more amounts are not distributed with respect to an Unvested Class C Interest pursuant to clause (A) of this sentence and such Unvested Class C Interest subsequently vests, then all Distributions pursuant to this Section 6.3(a) made following the vesting of such Class C Interest shall be made such that, on a cumulative basis, the Distributions with respect to such Class C Interest equal the Distributions that would have been made with respect to such Unvested Class C Interest if it had been a Vested Class C Interest beginning on the date of its original issue.

(b)      Profits Interests.  The Class C Interests are intended by the Company and each Member to constitute "profits interests" in the Company within the meaning of Rev. Proc. 93-27, 1993-2 C. B. 343, as modified by Rev. Proc. 2001-43, 2001-2 C.B. 191.

(c)      Thresholds.  Notwithstanding anything to the contrary contained in this Agreement, the Board of Managers in its sole discretion shall be authorized to establish distribution thresholds with respect to any Class C Interests issued to any Member pursuant to this Agreement or any separate membership interest grant or similar agreement between such Member and the Company, and such Class C Interests shall not be entitled to any Distributions unless and until Distributions have been made that are, in the aggregate, in excess of such distribution thresholds. Unless otherwise determined by the Board or provided in the applicable agreement pursuant to which Class C Interests were issued, the threshold with respect to an Class C Interest shall be equal to the amount that would be Distributed with respect to all Membership Interests pursuant to Section 6.3(a) in a hypothetical transaction in which the Company sold all of its assets for fair market value (as determined by the Board) and distributed the proceeds therefrom in liquidation of the Company pursuant to Section 6.8 (as determined immediately prior to the issuance of such Class C Interests).  The distribution thresholds of each Class C Interest shall be adjusted after the grant of such Class C Interest in the following manner: (i) in the event of any Distribution pursuant to Section 6.3(a) or any redemption or repurchase of Membership Interests by the Company, the distribution thresholds of each Class C Interest outstanding at the time of such distribution, redemption or repurchase shall be reduced (but not below zero) by the amount of such Distribution or the amount paid by the Company in connection with such redemption or repurchase; and (ii) in the event of any Capital Contribution with respect to Membership Interests issued after such Class C Interest is issued, the distribution thresholds of such Class C Interest outstanding at the time of such Capital Contribution shall be adjusted by the Board to reflect the economic rights of such new Membership Interests.

(d)      All amounts withheld pursuant to the Code or any provisions of state or local tax laws with respect to any payment or Distribution to the Members from the Company shall be treated as amounts distributed to such Members under this Section 6.3.

6.4     Tax Distributions.  To the extent funds of the Company are available for distribution by the Company (as determined in good faith by the Board of Managers) and so long as the Company is treated as a partnership for federal income tax purposes, the Board of Managers shall cause the Company to distribute to the Members within 30 days after the end of each Fiscal Year (or at such earlier times and in such amounts as determined in good faith by the Board to be appropriate for the Members to pay quarterly estimated income tax liabilities), with respect to such Fiscal Year an amount of cash (a "Tax Distribution") that in the good faith judgment of the Board of Managers equals the product of (i) the net taxable income allocated by the Company to such Member (ignoring the effect of any election under Section 754 of the Code or any comparable provision of state or local law) for such Fiscal Year reduced by the net taxable loss of the Company allocated with respect to the Membership Interests held by such Member for all taxable periods beginning on or after the Effective Date not previously taken into account for purposes of this Section 6.4; multiplied by (ii) the combined maximum federal, state

32

and local income tax rate to be applied with respect to such taxable income (calculated by using the highest maximum combined marginal federal, state and local income tax rates (including the Medicare contribution tax of Section 1411 of the Code) applicable to any Member (or for any Member that is a flow-through entity for federal income tax purposes, any of its beneficial owners) and taking into account the character of such taxable income and the deductibility of state income tax for federal income tax purposes, as such tax rate is reasonably determined by the Board and consistently applied to all Members for such Fiscal Year); provided, however, that to the extent that the cumulative amount of quarterly estimated Tax Distributions made in any Fiscal Year exceeds the amount of the total Tax Distribution to be made to a Member pursuant to the formula above, such excess shall reduce Tax Distributions due to such Member in subsequent Fiscal Years.  Tax Distributions shall be considered advances against distributions under Section 6.3(a)(i) and Section 6.3(a)(iii).    Notwithstanding the foregoing, solely for purposes of determining the net taxable income in clause (i) of this Section 6.4 for each Member for the taxable periods from the Effective Date until the repayment in full of the obligations outstanding under the Senior Credit Agreement as in effect on the Effective Date, such net taxable income shall be further reduced by the net taxable loss of the Company allocated to such Member for the period from January 1, 2015 to the Effective Date.

6.5    Limitation Upon Distributions.  There are no limitations on Distributions except as specifically provided in the Senior Credit Agreement, other Sections of this Agreement, and under the Act.

6.6    Special Allocations.  The following special allocations shall be made in the following order:

(a)    Special Gross Income Allocations.  To the extent any compensation paid to any Member by the Company is determined by the Internal Revenue Service not to be a guaranteed payment under Code Section 707(c) or is not paid to the Member other than in the Person's capacity as a Member within the meaning of Code Section 707(a), the Member shall be specially allocated gross income of the Company in an amount equal to the amount of that compensation, and the Member's Capital Account shall be adjusted to reflect the payment of that compensation.

(b)    Minimum Gain Chargeback.    Except as otherwise provided in Section 1.704-2(f) of the Treasury Regulations, notwithstanding any other provision of this Article VI, if there is a net decrease in Company Minimum Gain during any Taxable Year, each Member shall be specially allocated items of Company income and gain for such Taxable Year (and, if necessary, subsequent Taxable Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g).  Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated shall be determined in accordance with Sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Treasury Regulations.    This Section 6.6(b) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(f) of the Treasury Regulations and shall be interpreted consistently therewith.

(c)     Member Minimum Gain Chargeback.  Except as otherwise provided in Section 1.704-2(i)(4) of the Treasury Regulations, notwithstanding any other provision of this Article VI, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Taxable Year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(5) of the Treasury Regulations, shall be specially allocated items of Company income and gain for such Taxable Year (and, if necessary, subsequent Taxable Years) in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt, determined in accordance with Treasury Regulations Section 1.704-2(i)(4).  Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated shall be determined in accordance with Sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Treasury Regulations.   This Section 6.6(c) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Treasury Regulations and shall be interpreted consistently therewith.

(d)     Qualified Income Offset.  In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5), or (6), items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the deficit balance in its Capital Account created by such adjustments, allocations, or distributions as promptly as possible, This Section 6.6(d) is intended to comply with the "qualified income offset" requirement of Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(3) and shall be interpreted consistently therewith.

(e)     Gross Income Allocation.  In the event any Member has a deficit Capital Account at the end of any Taxable Year which is in excess of the sum of (i) the amount such Member is deemed to be obligated to restore, if any, pursuant to any provision of this Agreement and (ii) the amount such Member is obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 6.6(e) shall be made only if and to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Article VI have been made as if Section 6.6(d) and this Section 6.6(e) were not in the Agreement.

(f)     Nonrecourse Deductions.  Nonrecourse Deductions shall be specially allocated to the Members in proportion to their respective Membership Interests.

(g)     Member Nonrecourse Deductions.  Any Member Nonrecourse Deductions for any Taxable Year shall be specially allocated to the Member who bears the economic risk of loss with respect to the liability to which such Member Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i).

34

(h)     Section 754 Adjustments.  To the extent an adjustment to the adjusted tax basis of any Company asset, pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(2) or 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as the result of a Distribution to a Member in complete liquidation of such Member's interest in the Company, the amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Member in accordance with their interests in the Company in the event Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(2) applies, or to the Member to whom such Distribution was made in the event Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4) applies.

(i)     Loss Limitation.  Losses allocated pursuant to Section 6.2 hereof shall not exceed the maximum amount of Losses that can be allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any Taxable Year.  In the event some but not all of the Members would have Adjusted Capital Account Deficits as a consequence of an allocation of Losses pursuant to Section 6.2 hereof, the limitation set forth in this Section 6.6(i) shall be applied on a Member by Member basis and Losses not allocable to any Member as a result of such limitation shall be allocated to the other Members in accordance with the positive balances in such Member's Capital Accounts so as to allocate the maximum permissible Losses to each Member under Regulations Section 1.704-1(b)(2)(ii)(d).

(j)     Curative Allocations.  The allocations set forth in Sections 6.6(b) through (i) (the "Regulatory Allocations") are intended to comply with certain requirements of the Regulations.  It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section 6.6(j).  Therefore, notwithstanding any other provision of this Article VI (other than the Regulatory Allocations), the Board of Managers shall make such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Sections 6.2 and 6.6(a).

6.7     Tax Allocations.

(a)     Except as otherwise provided in this Section 6.7, the income, gains, losses, deductions and credits of the Company will be allocated, for federal, state and local income tax purposes, among the Members in accordance with the allocation of such income, gains, losses, deductions and credits among the Members for computing their Capital Accounts.

(b)     In accordance with Code Section 704(c) and the Treasury Regulations thereunder, as well as Treasury Regulations Section 1.704-1(b)(2)(iv)(d)(3), income,

gain, loss, and deduction with respect to any property contributed (or deemed contributed) to the Company shall, solely for tax, bookkeeping and financial accounting purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of the property to the Company for federal income tax purposes and its fair market value at the date of contribution (or deemed contribution). If the adjusted book value of any Company asset is adjusted as provided herein, subsequent allocations of income, gain, loss, and deduction with respect to the asset shall take account of any variation between the adjusted basis of the asset for federal income tax purposes and its Book Value in the manner required under Code Section 704(c) and the Treasury Regulations thereunder using the traditional method with curative allocations pursuant to Treasury Regulation 1.704-3(c).

(c)     Allocations of tax credits, tax credit recapture, and any items related thereto shall be allocated to the Members according to their interests in such items as determined by the Board taking into account the principles of Treasury Regulation Section 1.704-1(b)(4)(ii).

(d)     For purposes of determining a Member's proportional share of the Company's "excess nonrecourse liabilities" within the meaning of Treasury Regulation Section 1.752-3(a)(3), each Member's interest in income and gain shall be in proportion to its Membership Interest.

(e)     Allocations pursuant to this <u>Section 6.7</u> are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, Distributions or other Company items pursuant to any provision of this Agreement.

6.8     <u>Distributions Upon Liquidation of the Company</u>.   Upon liquidation of the Company, the assets of the Company shall be distributed promptly after the date of such liquidation and shall be applied in the following order of priority:

(a)     to the payment of debts and liabilities of the Company (including amounts owed to Members or former Members);

(b)     unless inconsistent with Treasury Regulation Section 1.704-1(b)(2)(ii)(b), or any successor provision, to set up any reserves that the Board of Managers deems reasonably necessary for contingent or unforeseen liabilities or obligations of the Company arising out of or in connection with the business of the Company; and

(c)     after all Capital Account adjustments for the Company's taxable year in which the liquidation occurs (including adjustments required under Treasury Regulation Section 1.704-1(b)(2)(iv)(e), relating to Distributions in kind), to the Members in accordance with <u>Section 6.3(a)</u>.

## ARTICLE 7
## Transferability

7.1    Restrictions on Transfer of Membership Interests.

(a)    Except as otherwise specifically provided herein, no Membership Interest shall or can be Transferred without Board Approval; provided, however, such approval shall not be required for a Transfer of Membership Interests by a Member (a) to a trust, whether inter vivos or testamentary, for the benefit of one or more of the Member's Family Members, (b) to a Family Member of the Member, (c) to an Affiliate of the Member or (d) to any other Member or an Affiliate thereof (so long as, with respect to this clause (d), such transferee (together with its Affiliates) does not own more than 33.33% of the Voting Membership Interests after taking into account the applicable Transfer).

(b)    Notwithstanding anything to the contrary contained in this Agreement, no Member shall Transfer all or any portion of its Membership Interest if such Transfer:

(i)    unless such condition is waived by the Board, when added to the total of all other sales, transfers or assignments of Membership Interests within the preceding twelve (12) months, would result in the Company being considered to have terminated within the meaning of Code Section 708;

(ii)    would otherwise cause the Company to lose its status as a partnership for federal income tax purposes;

(iii)    would violate any federal securities laws or any applicable state securities laws (including suitability standards);

(iv)    would require registration of such Transfer under the Securities Act or any applicable state securities or blue sky law or similar law requiring registration; or

(v)    is to an OFAC Prohibited Person.

(c)    Notwithstanding anything to the contrary herein, in the event that the Company has made a loan to, or otherwise guaranteed indebtedness of, a Member (or any direct or indirect owner of a Member), then, unless otherwise approved by the majority of the Board of Managers, no such Member shall Transfer all or any portion of such Member's Membership Interest unless such Member shall cause the Company's loans to or guarantees of indebtedness of such Member (or any direct or indirect owner of a Member) to be discharged in full prior to or at the time of such Transfer.

7.2    Tag-Along Rights.

(a)    With the exception of Transfers in accordance with Section 7.7 or pursuant to the proviso set forth in Section 7.1(a), at least 30 days prior to any Transfer of

37

Class A Interests or Class B Interests by SLG or any of its Affiliates, successors, assigns or Transferees, each such holder of Class A Interests or Class B Interests making such Transfer (the "Transferring Member") shall deliver a written notice (the "Sale Notice") to the Company and each of the other Members holding Class A Interests or Class B Interests (the "Tag-Along Interests"), specifying in reasonable detail the identity of the prospective Transferee(s) (which Transferee(s) must be an "accredited investor" as defined in Regulation D promulgated under the Securities Act), the number of Class A Interests or Class B Interests to be Transferred and the terms and conditions of the Transfer. The other Members holding Tag-Along Interests may elect to participate in the contemplated Transfer (the "Electing Members") by delivering written notice to the Transferring Member within 20 days after delivery of the Sale Notice. The Transferring Member and each Electing Member shall be entitled to sell in the contemplated Transfer, at the same price (unless determined otherwise pursuant to Section 7.2(d)) and on otherwise the same terms, a number of Voting Membership Interests equal to the product of (i) the quotient determined by dividing the number of Voting Membership Interests owned by such Electing Member by the aggregate number of Voting Membership Interests owned by the Transferring Member and all of the Electing Members and (ii) the number of Voting Membership Interests to be sold in the contemplated Transfer; provided, however, that if all of the Tag-Along Interests are not Class A Interests, the price and number of Voting Membership Interests to be sold by an Electing Member shall be determined pursuant to Section 7.2(d). Any Electing Member may elect to sell in any Transfer contemplated under this Section 7.2 a lesser number of Tag-Along Interests than such Electing Member is entitled to sell hereunder, in which case the Transferring Member shall have the right to sell additional Voting Membership Interests in such Transfer equal to the number that such Electing Member has elected not to sell. If the other Members holding Tag-Along Interests have not elected to participate in the contemplated Transfer (through notice to such effect or expiration of the 20-day period after delivery of the Sale Notice without delivery of notice of participation), then the Transferring Member may Transfer Voting Membership Interests in an amount equal to those Membership Interests that such Members could have included in such Transfer at a price and on terms no more favorable to the Transferee(s) thereof than specified in the Sale Notice during the 120-day period immediately following the date of the delivery of the Sale Notice. Any Transferring Member's Voting Membership Interests not Transferred within such 120-day period shall be subject to the provisions of this Section 7.2 upon subsequent Transfer.

(b)    Each Transferring Member shall use commercially reasonable efforts to obtain the agreement of the prospective Transferee(s) to the participation of the Electing Members, and no Transferring Member shall Transfer any of its Voting Membership Interests to any prospective Transferee if such prospective Transferee(s) declines to allow the participation of the Electing Members; provided, however, that notwithstanding the foregoing, such Transferring Member may Transfer its Voting Membership Interests to such prospective Transferee if such Transferring Member agrees to purchase (subject to Section 7.2(d) below, at the same price and on the same terms as set forth in the Sale

Notice) such Electing Members' Tag-Along Interests that the Electing Members have elected to Transfer.

(c)     In the event of a tag-along transaction contemplated by this Section 7.2, (i) any holdback or escrow in connection with such transaction shall be pro rata among the Transferring Member and Electing Members based on the Reverse Waterfall Priority, (ii) each Electing Member's obligation for indemnification (other than any such obligations that relate specifically to a particular Electing Member, such as indemnification with respect to the Member Representations given by an Electing Member) shall be proportionate (and not joint and several) and limited to his, her or its pro rata portion (determined based on the Reverse Waterfall Priority) of such indemnity and limited, in the aggregate, to the aggregate proceeds actually received by such Electing Member in connection with such Transfer, and (iii) each such Member, including the Transferring Member, shall pay for all transaction costs and expenses incurred by such Member on an individual basis, and its pro rata portion (determined based on the Reverse Waterfall Priority) of those transaction costs and expenses incurred for the benefit of the sellers as a group in connection with such sale, in each case, to the extent not otherwise paid by the Company or the acquiring party, with each such Member's liability for its pro rata share of the allocated costs and expenses being limited to the aggregate proceeds actually received by such Member in respect of such sale in exchange for such Member's Membership Interests.

(d)     Notwithstanding anything to the contrary in the foregoing, with respect to any Electing Member that elects to Transfer any Tag-Along Interests of a class of Membership Interests different than the class of Membership Interests proposed to be transferred by the Transferring Member, (i) the price per Membership Interest to be received by such Electing Member in such Transfer shall be determined in good faith by Board Approval in good faith as if the Company had been sold for the valuation implied by such Transfer (by extrapolating such valuation to a sale of all of the Membership Interests on a fully-diluted basis, without regard to minority discount or voting control (or lack thereof) based upon the per Membership Interest price to be paid by the proposed Transferee of the Tag-Along Interests as set forth in the notice) and the proceeds of such sale had been distributed by the Company in complete liquidation pursuant to Section 6.8 and (ii) the number of Membership Interests that can be sold shall be determined such that the Transferring Member and each Electing Member shall receive the relative percentage of the proceeds that they would be entitled to receive in a complete liquidation pursuant to Section 6.8, based on the price per Membership Interest determined pursuant to clause (i) above.

7.3     Reserved

7.4     Death or Incapacity of Member.  Upon the death or mental or physical incapacity of a physician Member or any physician who directly or indirectly holds an equity or beneficial interest in a Member (any of the foregoing a "Physician Member"), the Company shall have the option to purchase the Membership Interest of such Physician Member for a price equal to the fair market value of the Membership Interest as determined by a qualified appraisal approved by

the Board of Managers (the "Repurchase Price").  Such option shall begin upon the Member's date of death or determination of incapacity by a licensed physician selected by the Board of Managers and shall expire ninety (90) days thereafter.  If the Company desires to exercise its option under this Section 7.4, then the Company shall notify the Physician Member's estate or guardian (or their equivalent) and each remaining Member of its intent to exercise its option.  The Company must pay the Repurchase Price to the Physician Member's estate or guardian within ninety (90) days of such notification and must immediately notify the remaining Members of its payment of the Repurchase Price.  The Company may purchase life insurance to fund the exercise of its option to purchase under this Section 7.4.

In the event the Company elects not to exercise its option to purchase under this Section 7.4 or fails to pay the Repurchase Price within the time required under this Section 7.4, the Company's option to purchase shall terminate, and the remaining Qualified Holders shall have an option to purchase the Membership Interest of such Physician Member for a period of sixty (60) days at the Repurchase Price.  During such sixty (60) day period, any remaining Qualified Holder may give notice to the Physician Member's estate or guardian, to the Company, and to the other remaining Qualified Holders that such Member intends to purchase all, but not less than all, of the Membership Interest of the Physician Member.  If two (2) or more remaining Qualified Holders desire to purchase the Membership Interest, then, in the absence of an agreement between or among them, each such remaining Qualified Holder shall purchase the Membership Interest of the Physician Member in the proportion that his, her or its respective Membership Interest bears to the total Membership Interests of all of the remaining Qualified Holders who desire to purchase the Membership Interest.  Any remaining Qualified Holders who elect to exercise their option to purchase under this Section 7.4 must pay the Repurchase Price (or their portion thereof) within ninety (90) days of their giving notice of their intent to exercise their option to purchase.

7.5    Substituted and Additional Members.  No Member shall have the right to substitute in its place a purchaser, assignee, transferee, donee, heir, legatee, distributee or other recipient of all or any portion of the Membership Interest of such Member.  Any such purchaser, assignee, transferee, donee, legatee, distributee or other recipient of any interest shall be admitted to the Company as a substituted Member only with the approval of the Board of Managers; provided that such approval shall not be required for a Transferee pursuant to the proviso in Section 7.1(a).  Any Person may, subject to the terms and conditions of this Agreement, become an additional Member in the Company by the issuance of new Membership Interests as approved by the affirmative vote of the Board of Managers and by execution of a counterpart to this Agreement.  Any Person holding loans outstanding under the Convertible Bridge Loan Agreement who is not already a Member shall automatically be admitted as a Member upon conversion of such loans into Class A Interests in accordance therewith.

7.6    Reasonableness of Restrictions.  Each Member hereby acknowledges the reasonableness of the prohibitions contained in this Article in view of the purposes of the Company and the relationship of the Members.  The transfer of any Membership Interest or interest therein in violation of the prohibitions contained in this Article shall be deemed invalid, null and void, and of no force or effect.  Any Person to whom a Membership Interest or any interest therein are attempted to be transferred in violation of this Section shall not be entitled to

vote on matters coming before the Members, participate in the management of the Company, act as an agent of the Company, receive Distributions from the Company or have any rights in or with respect to the Membership Interest.

7.7    Drag Along Rights

(a)    If the Board of Managers approves a proposal for the Transfer (or series of related Transfers) (via merger, consolidation or otherwise) of all of the Membership Interests or all or substantially all of the assets of the Company, in each case to an independent third Person that is not an Affiliate of SLG (each an "Approved Sale"), then, subject to the Company having obtained the approval required under Section 3.8(a)(iv) to the extent required thereunder, each Member shall vote for, consent to and raise no objections against such Approved Sale, subject to the limitations contained in this Section 7.7.  If the Approved Sale is structured as a (x) merger, consolidation or sale of all or substantially all assets, each Member shall waive any dissenters rights, appraisal rights or similar rights in connection with such merger, consolidation or sale of all or substantially all assets or (y) sale of Membership Interests, each holder of Membership Interests shall agree to sell all of his, her or its Membership Interests and rights to acquire Membership Interests on the terms and conditions approved by the Board of Managers, subject to the limitations contained in this Section 7.7.  Subject to the provisions of this Section 7.7, each Member shall take all reasonable actions in connection with the consummation of the Approved Sale as reasonably requested by the Board of Managers, including, without limitation, becoming party to a purchase and sale agreement or merger agreement related to the Approved Sale.

(b)    The obligations of the Members with respect to the Approved Sale are subject to the satisfaction of the conditions that (i) the material terms and conditions of the Approved Sale, including the type of consideration and payment terms applicable with respect to all Membership Interests within each respective class of Membership Interests, are identical in all material respects, (ii) each Member receives in such Approved Sale an amount of consideration in respect of such Member's Membership Interests that such Member would receive if the aggregate consideration payable in such Approved Sale was distributed pursuant to Section 6.3(a) and (iii) the obligations set forth in Section 7.7(c) with respect to such Approved Sale shall be satisfied.  Each Member shall take all reasonable actions in connection with the distribution of the aggregate consideration from the sale or exchange by the Members of Membership Interests held by the Members (whether by sale, merger, recapitalization, reorganization, consolidation, combination or otherwise) as may be reasonably requested by the Board of Managers; provided, however, that any holdback or escrow in connection with such Approved Sale shall be  pro rata (based on the Reverse Waterfall Priority).

(c)    Each Member Transferring Membership Interests pursuant to this Section 7.7 (including SLG) shall pay its pro rata share (determined based on the Reverse Waterfall Priority) of the expenses incurred by the Members in connection with such Transfer if such expenses were incurred at the direction of Board of Managers (not to exceed the aggregate proceeds received by such Member in its capacity as an equity

holder of the Company in connection with such Approved Sale) and shall be obligated to join on a several, but not joint and several, basis in any indemnification or other obligations that Board of Managers agrees to provide in connection with such Transfer; provided, that (i) each Member shall only be required to make customary representations and warranties with respect to itself, including, without limitation, representations and warranties regarding due power, authority, non-contravention, enforceability and broker's fees with respect to such Member and the ownership of such Member's Membership Interests free and clear of all liens (the "Member Representations"), (ii) such Member's obligation for indemnification (other than any such obligations that relate specifically to a particular Member, such as indemnification with respect to the Member Representations given by a Member) shall be limited to his, her or its pro rata portion (determined based on the Reverse Waterfall Priority) of such indemnity and (iii) such Member's obligation for indemnification shall be limited, in the aggregate, to the aggregate proceeds actually received by such Member in connection with such Transfer; provided, to the extent that any Member's liability for indemnification in such Approved Sale exceeds the net cash proceeds actually received by such Member in connection with such Approved Sale, such excess shall be satisfied only out of the non-cash portion of the proceeds paid to such Member in connection with such Approved Sale.

(d)    In addition, if the Board of Managers approves a Public Offering, then each Member shall vote for, consent to (to the extent it has any voting or consenting rights) and raise no objections against such Public Offering, and each Member shall take all reasonable actions in connection with the consummation of such Public Offering as requested by the Board of Managers, including without limitation voting for, consenting to (to the extent it has any voting or consenting rights) and raising no objections against any recapitalization, conversion or merger undertaken in connection therewith; provided, that, in connection with any such Public Offering, the Board causes the holders of Membership Interests (including Class A Interests, Class B Interests and Class C Interests) to receive, as a result of such Public Offering, securities which reflect and are consistent with the Membership Interests, Distribution preferences and Capital Accounts as in effect immediately prior to such transaction(s).

(e)    Without limiting the terms of Section 3.8, in no manner shall this Section 7.7 be construed to grant to any Member any dissenters rights or appraisal rights or give any Member any right to vote in any transaction structured as a merger or consolidation (it being understood that the Members have expressly waived rights under Section 18-210 of the Act and have granted to the Board of Managers the sole right to approve or consent to a merger or consolidation of the Company without approval or consent of the Members, as provided in this Agreement).

## ARTICLE 8
## Dissolution and Termination

8.1    Dissolution of the Company.

(a)　　The Company shall be dissolved only (i) upon the determination by the Board of Managers, (ii) upon the occurrence of any event causing dissolution of the Company under the laws of the State of Delaware or (iii) pursuant to the remaining provisions of this Agreement.

(b)　　If the Company is dissolved, the Board of Managers shall wind up the Company's affairs.  Upon winding up of the Company, the assets of the Company shall be distributed in accordance with Section 8.2 below.

(c)　　If the Company is dissolved, the Board of Managers shall promptly file such documents and instruments, including a certificate of cancellation, as required under the Act to terminate the existence of the Company.  If there is no Board of Managers, such documents and instruments shall be filed by the legal or personal representatives of the Person who last was a Member.

(d)　　Termination, dissolution, liquidation, or winding up of the Company for any reason shall not release any party from any liability which at the time of such termination, dissolution, liquidation, or winding up already had accrued to any other party or which thereafter may accrue in respect of any act or omission prior to such termination, dissolution, liquidation or winding up.

(e)　　Members and former Members shall look solely to the Company's assets for the return of their Capital Contributions to the Company, and if the assets of the Company remaining after payment of or due provision for all debts, liabilities, and obligations of the Company are insufficient to return such Capital Contributions, the Members and former Members shall have no recourse against the Company or any other Member.

8.2　　Liquidation, Dissolution and Termination.　　If the Company is liquidated, dissolved, or terminated, the assets of the Company shall be distributed pursuant to Section 6.8.  No Member shall be obligated to restore a deficit Capital Account upon liquidation, dissolution, or termination of the Company, or at any other time.

## ARTICLE 9
### Books and Records; Accounting; Tax Elections

9.1　　Accounts.  All funds of the Company shall be deposited in a bank account or accounts maintained in the Company's name.  The Board of Managers shall determine the institution or institutions at which the accounts will be opened and maintained, and the types of accounts to be opened and maintained.

9.2　　Records and Reports.

(a)　　At the expense of the Company, the Company shall maintain records and accounts of all operations and expenditures of the Company.  At a minimum, the Company shall keep at its principal place of business the following records:

(i)       a current list that states:

1.       the name and mailing address of each Member; and

2.       the Membership Interest owned by each Member;

(ii)      copies of the federal, state and local information on income tax returns for each of the Company's six most recent years; and

(iii)     a copy of the Certificate and this Agreement (and all amendments or restatements of the Certificate and this Agreement), executed copies of any powers of attorney, and copies of any document that creates, in the manner provided by the Certificate or this Agreement, classes or groups of Members.

(b)       The Company will furnish to each Member holding at least 2.00% of the outstanding Voting Membership Interests with reasonable promptness (i) the information described in Section 9.2(a)(i)-(iii) and (ii) any financial information prepared by the Company for delivery to its institutional lenders in the ordinary course of business, in each case upon written request, which request may not be made more frequently than once per calendar quarter.

(c)       Upon no less than thirty (30) days' prior written notice to the Company from an applicable Member, the Company will permit each Member holding at least 2.00% of the outstanding Voting Membership Interests, at such Member's sole cost and expense, to visit and inspect the Company's books and records located at the Company's principal place of business, for no more than one (1) business day during normal business hours.  The Company shall not be required to host inspections by Members more than four (4) business days in the aggregate per calendar year.

9.3       Tax Matters Partner.  SLG shall be the Company's tax matters partner (the "Tax Matters Partner").  The Tax Matters Partner shall have all powers and responsibilities provided in Section 6231(a)(7) of the Code.  The Tax Matters Partner shall also keep all Members informed of all notices from government taxing authorities which may come to the attention of the Tax Matters Partner.  The Company shall pay and be responsible for all reasonable third-party costs and expenses incurred by the Tax Matters Partner in performing those duties.  A Member shall be responsible for any costs incurred by the Member with respect to any tax audit or tax-related administrative or judicial proceeding against any Member, even though it relates to the Member's Membership Interest in the Company.  The Tax Matters Partner may not compromise any dispute with the Internal Revenue Service without the consent of the Board of Managers.  For all taxable years beginning on or after January 1, 2018, SLG shall be designated as the "partnership representative" (the "Partnership Representative"), as defined in Code Section 6223 (as in effect following the effective date of its amendment by Section 1101 of H.R. 1314, the "Bipartisan Budget Act of 2015") and the Company, the Board and the Members shall complete any necessary actions (including executing any required certificates or other documents) to effect such designation.  SLG may make any elections available to be made as Partnership Representative, including, without limitation, the election described in Code Section

44

6226(a)(1) (as in effect following the effective date of its amendment by Section 1101 of the Bipartisan Budget Act of 2015).  Notwithstanding the foregoing, the Partnership Representative shall take all such actions as are necessary or appropriate to cause the Members of the Company in respect of each subject tax year under partnership audit or review (regardless of whether a current or former Member in the tax year in which the audit or review occurs) to be responsible for any adjustments in such subject tax year based on their respective economic rights as of such subject tax year in accordance with Code Section 6226 (as in effect following the effective date of its amendment by Section 1101 of the Bipartisan Budget Act of 2015) or otherwise.

9.4     <u>Financial Statements, Returns and Other Elections</u>.  The Company shall deliver to each Member holding at least 1.00% of the outstanding Voting Membership Interests (in the aggregate) with the following: (a) annual audited financial statements of the Company and its Subsidiaries and (b) quarterly unaudited financial statements of the Company and its Subsidiaries, in each case in substantially similar form and substance as delivered by the Company and/or any of its Subsidiaries pursuant to the Senior Credit Agreement or pursuant to any replacement or successor credit or similar agreement reasonably promptly after the delivery thereof to such senior lenders pursuant to such agreement.  The Company shall cause the preparation and timely filing of all tax returns required to be filed by the Company pursuant to the Code and all other tax returns deemed necessary and required in each jurisdiction in which the Company does business.  The Tax Matters Partner may sign the Company's tax returns or, in its discretion, delegate that responsibility to another Member.  Copies of Schedule K-1s and such returns, or pertinent information therefrom, shall be furnished to the Members within one hundred eighty (180) days after the end of each fiscal year of the Company (which is the calendar year), unless the tax returns are extended pursuant to state or federal statutes, in which case the Schedule K-1s and tax returns shall be delivered to the Members no later than within ten (10) days of the filing of the federal tax returns.  All elections permitted to be made by the Company under federal or state laws shall be made by the Board of Managers.

**ARTICLE 10**
**<u>Miscellaneous Provisions</u>**

10.1     <u>Notices</u>.  Any notice, demand or communication required or permitted to be given by any provision of this Agreement shall be deemed to have been sufficiently given or served for all purposes if delivered personally to (or refused by) the party or to an officer of the party to whom the same is directed or, if sent by reputable overnight courier, charges prepaid, addressed to the Member's and/or Company's address as it appears in the Company's records, as appropriate.  Except as otherwise provided herein, any such notice shall be deemed to be given one (1) business days after the date on which the same was sent via reputable overnight courier.

10.2     <u>Application of Delaware Law; Arbitration</u>.  This Agreement and the application or interpretation hereof shall be governed by the laws of the State of Delaware, including the Act, without reference to its choice of law rules.  Any controversy between the Company and/or the Members and/or holders of any Membership Interest arising out of, or relating to, this Agreement, including, without limitation, any controversy concerning the negotiation, validity or enforceability of this Agreement, or concerning the alleged inducements to enter into it, and any dispute as to whether a particular controversy is subject to arbitration, which cannot be settled

amicably by the parties, shall be finally, exclusively and conclusively resolved by mandatory arbitration conducted by a panel of three independent arbitrators in accordance with the JAMS Comprehensive Arbitration Rules, except to the extent that specific procedures are set forth herein.  Notwithstanding the foregoing, the Company and each Member shall be entitled to seek a temporary restraining order or other injunctive relief from a court of competent jurisdiction to restrain the Company or any other party from committing or continuing any violation of the provisions of this Agreement until such time as the controversy is adjudicated in arbitration, and, in the event injunctive relief is granted and a bond is posted in connection therewith, nothing herein shall prevent a party from executing on the bond or otherwise seeking monetary relief from the court if it shall be determined that the injunction was improperly or improvidently granted.  If the parties are unable to agree on the selection of an arbitrator, then the arbitrator shall be appointed by JAMS according to its rules on arbitrator selection, which appointment shall be made within ten (10) days of JAMS' receipt of notice from a party that the parties are unable to agree on an arbitrator.  Any party may institute arbitration by filing the required documents with the arbitration service and giving written notice to the other party.  A hearing shall be held by the arbitrator at JAMS' facilities located in the Borough of Manhattan in the State of New York within thirty (30) days of his or her appointment.  The decision of the arbitration panel shall be final and binding upon all parties hereto and shall be rendered pursuant to a written decision which contains a detailed recital of the arbitration panel's reasoning.  Judgment upon the arbitrator's award may be entered in any court having jurisdiction thereof pursuant to the Federal Arbitration Act, 9 U.S.C. Sec. 1, et seq.  The non-prevailing party in any such dispute shall pay all of the prevailing party's costs and expenses (including reasonable attorneys' fees) incurred in connection with such dispute.

10.3    No Action for Partition.  No Member, Granted Membership Interest, additional Member, substitute Member, assignee or transferee shall have any right to maintain any action for partition with respect to the property of the Company.

10.4    Headings and Sections.  The headings in this Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Agreement or any provision hereof.  Unless the context requires otherwise, all references in this Agreement to Sections or Articles shall be deemed to mean and refer to Sections and Articles in this Agreement.

10.5    Amendment of Agreement and Certificate:  Change in Company Approval Procedure.  Except as otherwise expressly provided by this Agreement or applicable law, this Agreement and the Certificate may be waived, amended, supplemented or restated only with the approval of the Board of Managers; provided that:

(a)    any such waiver, amendment, supplement or restatement that would materially and adversely amend any of the rights and preferences of any Member holding a class of Membership Interests or any class of Members in a manner disproportionate relative to any other Members holding such class of Membership Interests or class of Members shall require the consent of Members holding a majority of the Membership Interests held by the Members holding each such class or of the Members of each such class so disproportionately affected;

46

(b)      no such waiver, amendment, supplement or restatement shall adversely affect any rights or powers granted to any Member by name without the written consent of such Member; and

(c)      no such waiver, amendment, supplement or restatement to Section 3.8, 5.6, 5.7, 6.4, 7.1, 7.2, 7.7, 8.2, 10.5 or 10.13 or the defined terms as used therein shall adversely affect any of the rights or obligations of any Member without the written consent of SLG and Members holding at least a majority of the Voting Membership Interests not held by SLG or its Affiliates; provided, that an issuance of a new class of Membership Interests pursuant to Section 5.2 that ranks senior to, or has different rights than, Class A Interests, Class B Interests or Class C Interests or that dilutes the then-current Membership Interests shall not be deemed to adversely affect any of the rights or obligations of any Member for the purposes of this Section 10.5(c) (and this Agreement may be so amended, supplemented or restated to effectuate the issuance of such new class of Membership Interests without the consent of any such Member).

Upon obtaining the required approval of any amendment to this Agreement (as described in the preceding sentences of this Section 10.5), or the Certificate, the Board of Managers shall cause this Agreement to be so amended, and/or shall cause any amendment to the Certificate which may be necessary to be prepared in accordance with the Act, and such amendment to the Certificate shall be executed by an authorized officer of the Company and filed in accordance with the Act.

10.6   Informed Consent.

(a)      The Company has retained K&L Gates LLP ("KLG") in connection with the negotiation and execution of this Agreement, the Senior Credit Agreement, the Convertible Bridge Loan Agreement, the issuance of Class A Interests, the documents effecting the Rights Offering and the other documents, agreements and matters contemplated herein and therein (the "Transaction Documents"). KLG is not representing any Member in connection with the negotiation and execution of the Transaction Documents, the transactions contemplated therein, the management and operation of the Company or any dispute that may arise between or among the Members and the Company (such matters, together with any disputes which may arise in connection therewith, are referred to as "Company Legal Matters"). Except as provided in Section 10.12, each Member will, if he, she or it wishes legal counsel on a Company Legal Matter, retain his, her or its own independent legal counsel with respect thereto and will pay all fees and expenses of such independent legal counsel.

(b)      Each Member acknowledges that this Agreement and the other Transaction Documents has been prepared by internal counsel to the Company, KLG, and/or other legal counsel and advisors retained by the Company, and that, in certain instances, circumstances might exist or may later occur which could result in actual or perceived conflicts of interest between one or more of the Members. Accordingly, each Member has been encouraged to seek the counsel of his, her or its own attorneys or other advisors. In addition to the foregoing acknowledgements, each Member consents to the

preparation of this Agreement and the other Transaction Documents by the Company's internal legal counsel, and KLG, as the outside legal counsel to the Company, and hereby jointly waives (i) to the extent such right has not been exercised, the right to retain separate legal counsel in connection with the negotiation, preparation, review and execution of this Agreement or any Transaction Document, and (ii) the right to later assert any such conflict of interest against the Company, KLG or any other legal counsel which prepared this Agreement or any Transaction Document, in the prosecution or defense of any action.  Each Member also acknowledges and agrees that neither the internal legal counsel of the Company nor KLG, as the legal counsel representing the Company, has (A) represented any Member's individual interests and or (B) provided any advice to any specific Member or group or class of Members.

10.7    Numbers and Gender.  Where the context so indicates, the masculine shall include feminine and neuter, the neuter shall include feminine and masculine and the feminine shall include the masculine and neuter.

10.8    Binding Effect.  Except as herein otherwise provided to the contrary, this Agreement shall be binding upon and inure the benefit of the Members, their distributees, heirs, legal representatives, executors, administrators, successors and assigns.

10.9    Counterparts and Facsimile Signatures.  This Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original and shall be binding upon the Member who executed the same, but all of such counterparts when taken together, shall constitute the same Agreement.  Facsimile signatures or other electronic signatures shall have the same effect as original signatures.

10.10    Founder.  James S. St. Louis is authorized to state that he is the founder of the Company.

10.11    Amended and Restated Agreement.  This Agreement amends and restates the A&R LLC Agreement in its entirety and constitutes the entire agreement among the parties with respect to the subject matter hereof and supersedes all prior agreements or understandings, whether written or oral, with respect thereto.

10.12    Expenses.  The Company shall, or shall cause one of its Subsidiaries to, pay the reasonable out-of-pocket expenses of SLG and its Affiliates (including the reasonable fees and expenses of legal counsel and other advisors) arising in connection with (a) the preparation, negotiation and execution of this Agreement, the Transaction Documents and any amendments or waivers (whether or not the same become effective) under or in respect of the Transaction Documents and (b) SLG providing any advisory services of a nature that are customarily performed by equity sponsors with respect to their investments.

10.13    Termination and Waiver of Certain Indemnification and Other Matters.  Each Member signatory hereto acknowledges, for the avoidance of doubt, that this Agreement effects the termination of Section 6.9 of the A&R LLC Agreement, which provided for rights of distribution and payment to certain Members in respect of certain indemnification and other

48

matters.  Furthermore, each Member signatory hereto hereby waives, and agrees not to assert, any claim against the Company or its Subsidiaries which any Member or any of its Affiliates, predecessors, successors or assigns had, now has or may in the future have, relating to or arising in connection with (i) that certain Purchase Agreement, dated January 1, 2007 by and between the Company (or its Affiliate) and MVP-LSI LLC, (ii) that certain Membership Interest Purchase Agreement, dated September 1, 2014 by and among the sellers party thereto, the Company and SLG and (iii) any "Representation and Warranty Loss", "Bailey Litigation Loss", Direct Indemnitee Losses", and/or "Covenant Breach Losses" as each such term is defined in the A&R LLC Agreement.

(Signatures to Follow)

**IN WITNESS WHEREOF**, this Second Amended and Restated Limited Liability Company Agreement of LSI HoldCo LLC shall be effective as of the date and time first set forth above.

**COMPANY:**

LSI HOLDCO LLC,

a Delaware limited liability company

By: _____

    Name:  David Pillsbury

    Title:  Chief Executive Officer

**MEMBERS:**

EFO LASER SPINE INSTITUTE, LTD.

By:    Cypress GP, LLC,

        its General Partner

By:    EPO GP Interests, Inc.,

        its Managing Member

By: _____

    Name: _____

    Title: _____

S-1

Signature Page - Second A&R LLC Agreement of LSI Holdco LLC

**LSI HOLDCO LLC**

MEMBER CONSENT
AND
COUNTERPART SIGNATURE PAGE TO
SECOND AMENDED AND RESTATED
LIMITED LIABILITY COMPANY AGREEMENT

The undersigned hereby consents that the actions set forth in the foregoing preambles and resolutions shall have the same force and effect as if taken at a duly constituted meeting of the Members and, furthermore affirms that:

**I have received and reviewed the Second Amended and Restated Limited Liability Company Agreement of LSI Holdco LLC delivered to me on or about the day hereof. The terms of such Limited Liability Company Agreement are acceptable to me.**

EXECUTED this _11_ day of November 2016:

EFO LASER SPINE INSTITUTE, LTD.
By: Cypress GP, LLC
By: EFO GP Interests, Inc.

Name: _Julie Krupala_
Title: _Secretary_

**LSI HOLDCO LLC**

MEMBER CONSENT
AND
COUNTERPART SIGNATURE PAGE TO
SECOND AMENDED AND RESTATED
LIMITED LIABILITY COMPANY AGREEMENT

The undersigned hereby consents that the actions set forth in the foregoing preambles and resolutions shall have the same force and effect as if taken at a duly constituted meeting of the Members and, furthermore affirms that:

**I have received and reviewed the Second Amended and Restated Limited Liability Company Agreement of LSI Holdco LLC delivered to me on or about the day hereof. The terms of such Limited Liability Company Agreement are acceptable to me.**

EXECUTED this 10 day of November 2016:                **HORNE MANAGEMENT, INC.**

Name: William Horne

Title: CEO/President

## LSI HOLDCO LLC

### MEMBER CONSENT
### AND
### COUNTERPART SIGNATURE PAGE TO
### SECOND AMENDED AND RESTATED
### LIMITED LIABILITY COMPANY AGREEMENT

The undersigned hereby consents that the actions set forth in the foregoing preambles and resolutions shall have the same force and effect as if taken at a duly constituted meeting of the Members and, furthermore affirms that:

**I have received and reviewed the Second Amended and Restated Limited Liability Company Agreement of LSI Holdco LLC delivered to me on or about the day hereof. The terms of such Limited Liability Company Agreement are acceptable to me.**

EXECUTED this ___ day of November 2016:          **ROBERT GRAMMEN**

## LSI HOLDCO LLC

MEMBER CONSENT
AND
COUNTERPART SIGNATURE PAGE TO
SECOND AMENDED AND RESTATED
LIMITED LIABILITY COMPANY AGREEMENT

The undersigned hereby consents that the actions set forth in the foregoing preambles and resolutions shall have the same force and effect as if taken at a duly constituted meeting of the Members and, furthermore affirms that:

**I have received and reviewed the Second Amended and Restated Limited Liability Company Agreement of LSI Holdco LLC delivered to me on or about the day hereof. The terms of such Limited Liability Company Agreement are acceptable to me.**

EXECUTED this ___ day of November 2016:

**CTS EQUITIES LIMITED PARTNERSHIP**

Name: _____

Title: _____

## LSI HOLDCO LLC

### MEMBER CONSENT
### AND
### COUNTERPART SIGNATURE PAGE TO
### SECOND AMENDED AND RESTATED
### LIMITED LIABILITY COMPANY AGREEMENT

The undersigned hereby consents that the actions set forth in the foregoing preambles and resolutions shall have the same force and effect as if taken at a duly constituted meeting of the Members and, furthermore affirms that:

**I have received and reviewed the Second Amended and Restated Limited Liability Company Agreement of LSI Holdco LLC delivered to me on or about the day hereof. The terms of such Limited Liability Company Agreement are acceptable to me.**

EXECUTED this ___ day of November 2016:

**SLG LSI INVESTMENT, LLC**

Name: ___Jonathan B. Lewis___

Title: ___Member___

**LSI HOLDCO LLC**

MEMBER CONSENT
AND
COUNTERPART SIGNATURE PAGE TO
SECOND AMENDED AND RESTATED
LIMITED LIABILITY COMPANY AGREEMENT

The undersigned hereby consents that the actions set forth in the foregoing preambles and resolutions shall have the same force and effect as if taken at a duly constituted meeting of the Members and, furthermore affirms that:

I have received and reviewed the Second Amended and Restated Limited Liability Company Agreement of LSI Holdco LLC delivered to me on or about the day hereof. The terms of such Limited Liability Company Agreement are acceptable to me.

EXECUTED this ___ day of November 2016:        RDB EQUITIES LIMITED PARTNERSHIP

Name:  ROBERT D. BASHAM

Title:       MANAGER

## LSI HOLDCO LLC

### MEMBER CONSENT
### AND
### COUNTERPART SIGNATURE PAGE TO
### SECOND AMENDED AND RESTATED
### LIMITED LIABILITY COMPANY AGREEMENT

The undersigned hereby consents that the actions set forth in the foregoing preambles and resolutions shall have the same force and effect as if taken at a duly constituted meeting of the Members and, furthermore affirms that:

**I have received and reviewed the Second Amended and Restated Limited Liability Company Agreement of LSI Holdco LLC delivered to me on or about the day hereof. The terms of such Limited Liability Company Agreement are acceptable to me.**

EXECUTED this 10 day of November 2016:          **WH, LLC**

Name: William Horne

Title: CEO/President

**LSI HOLDCO LLC**

MEMBER CONSENT
AND
COUNTERPART SIGNATURE PAGE TO
SECOND AMENDED AND RESTATED
LIMITED LIABILITY COMPANY AGREEMENT

   The undersigned hereby consents that the actions set forth in the foregoing preambles and resolutions shall have the same force and effect as if taken at a duly constituted meeting of the Members and, furthermore affirms that:

   **I have received and reviewed the Second Amended and Restated Limited Liability Company Agreement of LSI Holdco LLC delivered to me on or about the day hereof.  The terms of such Limited Liability Company Agreement are acceptable to me.**

EXECUTED this ___ day of November 2016:

**MMPERRY HOLDINGS, LLLP**

Name: _Michael Perry_

Title: _General Partner_

**LSI HOLDCO LLC**

MEMBER CONSENT
AND
COUNTERPART SIGNATURE PAGE TO
SECOND AMENDED AND RESTATED
LIMITED LIABILITY COMPANY AGREEMENT

The undersigned hereby consents that the actions set forth in the foregoing preambles and resolutions shall have the same force and effect as if taken at a duly constituted meeting of the Members and, furthermore affirms that:

**I have received and reviewed the Second Amended and Restated Limited Liability Company Agreement of LSI Holdco LLC delivered to me on or about the day hereof. The terms of such Limited Liability Company Agreement are acceptable to me.**

EXECUTED this ___ day of November 2016:          **JAMES S. ST. LOUIS**

## LSI HOLDCO LLC

MEMBER CONSENT
AND
COUNTERPART SIGNATURE PAGE TO
SECOND AMENDED AND RESTATED
LIMITED LIABILITY COMPANY AGREEMENT

The undersigned hereby consents that the actions set forth in the foregoing preambles and resolutions shall have the same force and effect as if taken at a duly constituted meeting of the Members and, furthermore affirms that:

**I have received and reviewed the Second Amended and Restated Limited Liability Company Agreement of LSI Holdco LLC delivered to me on or about the day hereof. The terms of such Limited Liability Company Agreement are acceptable to me.**

EXECUTED this <u>8th</u> day of November 2016:     **DBF-LSI, LLC**

Name:  Edward J. DeBartolo, Jr.

Title:  Manager

## SCHEDULE A
## Names and Membership Interests of the Members
## Effective November 18, 2016[1]

| Name and Addresses of Members | Class A Capital Contributions | Class A Interests | Class B Interests | Class C Interests |
|---|---|---|---|---|
| **EFO Laser Spine Institute, Ltd.** c/o EFO Holdings. L.P. Attn: Bill Esping 2828 Routh Street, Suite 500 Dallas, TX 75201 | | | 1266.471128000 | |
| **James S. St. Louis** 44 Johnson Drive Aspen, CO 81611 | | | 280.221164600 | |
| **MMPERRY HOLDINGS, LLLP** 17115 Journeys End Drive Odessa, FL 33556 | | | 121.533984000 | |
| **Michael D. Surgen** 2368 Heritage Greens Drive Naples, FL 34119 | | | 21.168230200 | |
| **Glenn Hamburg** 1580 Mary Lane Tarpon Springs, FL 34689 | | | 30.007640000 | |
| **WH, LLC** c/o William Horne 19520 Gulf Boulevard, Unit 402 Indian Shores, FL 33785 | | | 57.460338000 | |
| **Horne Management, Inc.** c/o William Horne 19520 Gulf Boulevard, Unit 402 Indian Shores, FL 33785 | | | 170.723124000 | |
| **Robert P. Grammen** 2770 Indian River Boulevard, Suite 500 Vero Beach, FL 32960 | | | 59.410260000 | |
| **Prada Investment Holdings, LLC** 12326 Tarpon Springs Road Odessa, FL 33556 | | | 0.865280000 | |
| **Bereczki Management, Inc.** c/o Zoltan Bereczki 1672 Sea Breeze Drive Tarpon Springs, FL 34689 | | | 4.326400000 | |
| **Gruber Family Holdings, LLC** c/o Robert Gruber 1370 Gulf Blvd., #404 Clearwater, FL 33767 | | | 1.179620000 | |
| **Weiss Family Management, LLLP** c/o Gail Weiss or Dr. Michael Weiss 701 S. Howard Avenue, #106-226 | | | 4.326400000 | |

---

[1] Schedule A to be updated upon the conversion of loans into Class A Interests pursuant to the Convertible Bridge Loan Agreement.

Schedule A, Page 1

| Name and Addresses of Members | Class A Capital Contributions | Class A Interests | Class B Interests | Class C Interests |
|---|---|---|---|---|
| Tampa, FL 33606 | | | | |
| **Laserscopic Spine Services, Inc.** 290 Rue Des Lacs Tarpon Springs, FL 33688 | | | 15.173496000 | |
| **Clinton Phillips** 2510 Chimney Rock Road Houston, TX 77056 | | | 6.835374000 | |
| **RJPT LTD** 16251 Dallas Parkway Addison, TX 75001 | | | 335.720798400 | |
| **DBF-LSI, LLC** 15436 North Florida Avenue, Suite 200 Tampa, FL 33613 | | | 304.200000000 | |
| **Raymond Monteleone** 3965 North 32 Terrace Hollywood, FL 33021 | | | 1.082952000 | |
| **MARBL SOS, LTD.** PO Box 20304 Tampa, FL 33612 | | | 4.012398000 | |
| **Luke Family Company, Inc.** 9991 East Desert Beauty Drive Scottsdale, AZ 85255 | | | 0.692900000 | |
| **ORZO, LLC** 16327 Palmettoglen Court Lithia, FL 33547 | | | 1.521000000 | |
| **Jill Diane St. Louis** 2840 W. Bay Drive Belleair Bluffs, FL 33770 | | | 85.812859600 | |
| **SLG LSI Investment, LLC** c/o Sheridan Legacy Group Wrigley Building, South Tower 400 N. Michigan Avenue, Suite 900 Chicago, IL 60611 | | | 338.000000000 | |
| **CTS Equities, LP** 3717 West North B Street Tampa, FL 33609 | | | 80.776395960 | |
| **RDB Equities, LP** 4343 Anchor Plaza Parkway, Suite 1 Tampa, FL 33634 | | | 80.776395960 | |
| **Bill Allen** c/o Connie Hredecky 30025 Alicia Parkway, #200 Laguna Niguel, CA 92677 | | | 26.925465320 | |
| **TKE Investments, LLC** 850 S. Newport Avenue Tampa, FL 33606 | | | 26.925465320 | |
| **SLI Ventures, LLC** 17635 Tobacco Road Lutz, FL 33618-2808 | | | 26.925465320 | |
| **Paul Avery** 16205 Sonsoles de Avila Tampa, FL 33613 | | | 13.462732660 | |

Schedule A, Page 2

| Name and Addresses of Members | Class A Capital Contributions | Class A Interests | Class B Interests | Class C Interests |
|---|---|---|---|---|
| **Tim Gannon** <br> 777 South Flagler Drive, Suite 1801 <br> West Palm Beach, FL 33401 | | | 8.077639596 | |
| **John Cooper & Trudy Cooper** <br> 902 Druid Road West <br> Clearwater, FL 33756 | | | 5.385093064 | |
| TOTAL | | | 3380.000000000 | |

Schedule A, Page 3